981 A.2d 710

**James Lewis CLARK**

v.

**STATE of Maryland.**

**No. 0310, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Oct. 2, 2009.

Sherrie B. Glasser (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

RODOWSKY, J.

James Lewis Clark (Clark), appellant, is a lifelong thief and self-confessed heroin addict. On December 12, 2007, a jury in the Circuit Court for Montgomery County convicted him of multiple counts relating to the theft and use of credit cards stolen from a single victim. On March 13, 2008, he was sentenced to forty-five years in prison. His appeal presents the following questions:

"1. Was the evidence insufficient to sustain convictions for identity fraud, identity theft, and unauthorized disclosure of a credit card number?

"2. Did the trial judge impose an improper sentence?

a. Fundamental fairness and rule of lenity

b. Single Larceny Rule

c. Cruel and Unusual [Punishment]

"3. Should the conviction for theft over $500 merge into theft of a credit card under the circumstances of this case?"

### Background Facts

On June 25, 2007, Dr. Kurt Schluntz, an orthopedic surgeon at Suburban Hospital Outpatient Center (the Hospital), re-

ported that his wallet containing cash and credit cards was removed from his locker without his permission or knowledge. Dr. Schluntz testified "the locker door had been jammed open[.]" [1]

The State's principal witness was Brian Kruse, the Executive Team Leader for Asset Protection for Target Corporation. He was employed at the Target store located at 20908 Frederick Road in Germantown, Maryland, where his responsibilities included protecting the store from theft and fraud offenses. On June 25, 2007, Mr. Kruse, by means of monitors in the store's security camera system room, observed a customer attempting to purchase a thirty-two inch Philips television set that retailed for $839. Mr. Kruse was alerted to the pending transaction when the customer attempted to use three different credit cards to pay for the TV, but all were declined. The customer next moved to an ATM machine located within the store and unsuccessfully attempted to withdraw cash. Then the customer went to the "Food Avenue" of the store where he made a cash purchase at Pizza Hut. The customer thereafter exited the store to the parking lot. Once in the parking lot, the customer, who was still visible on the Target camera system, discarded the ATM receipt.[2] When he arrived at his vehicle, he dropped what appeared to be a black wallet on the pavement and kicked it under the adjacent car. After testifying to the above facts, Mr. Kruse made an in-court identification of Clark as the customer whom he had observed by video surveillance attempting the TV purchase and ATM withdrawal and making the Pizza Hut purchase. Store records demonstrated that all three credit cards used in the attempted TV purchase were issued to Kurt Schluntz.

While Mr. Kruse was observing Clark, he contacted Detective David Hill of the Montgomery County Police Department. Detective Hill responded to the parking lot in an unmarked

---

1. Guillermo Cuellar, a surgical assistant at the Hospital, also reported that $300 in $20 bills was removed from his locker without his permission or knowledge. The jury acquitted Clark of theft from Mr. Cuellar.

2. It stated that the PIN number was invalid.

car and, in conjunction with other police units, blocked Clark's vehicle. Clark was in the driver's seat of the vehicle, and another man was in the passenger seat; both were arrested. Clark possessed $280 in $20 bills.[3] By an inspection of the area surrounding the vehicle, the police recovered a black wallet. In the vehicle, stuffed down between the driver's seat and the center console, the police recovered credit cards issued to Kurt Schluntz by Sun Trust, American Express, Capital One Visa, and MBNA MasterCard. In the same location, the police found Dr. Schluntz's Blockbuster membership card, CVS photo ID, Care First Blue Cross/Blue Shield member card, and an Eddie Bauer store charge card. Also in the vehicle, Detective Hill recovered four Play Station 3(PS3) video games, a new PS3 game system, and a Toys 'R' Us receipt dated June 25, 2007, bearing a serial number matching that of the particular PS3 game system in the car.

A witness from the Toys 'R' Us store in Gaithersburg testified that when such items are purchased, the receipt will contain a serial number corresponding to that of the purchased item and that the product was valued at $599.99. Kurt Schluntz testified that he received a Sun Trust credit card statement indicating purchases from Toys 'R' Us totaling $732.97. He further testified he did not make those purchases.

Kyle Boorstein, the building engineer at the Hospital, testified that there are surveillance cameras at the front entrance of the Hospital that record people entering and exiting the building. Mr. Boorstein viewed the surveillance tapes for June 25, 2007, with Detective Hill. The tapes show a man entering the Hospital and, later, the same man exiting the Hospital with items under his left arm. Detective Hill compared the Hospital's video surveillance to that of Target. He was able to determine that Clark was the man represented in both. Subsequently, Detective Hill made an in-court identifi-

---

**3.** A Pizza Hut receipt recovered from Clark showed that he tendered a $20 bill for his purchase.

cation of Clark as the person shown on the tapes and the person whom he had arrested in the parking lot.

In the subject criminal cause, Clark was charged with seven counts of theft and identity fraud and found guilty on six.[4] These six offenses were alleged to have occurred on June 25. They related to Dr. Schluntz.

Count 1 charged that Clark did "with fraudulent intent possess and obtain personal identifying information of Kurt Schluntz," in violation of Maryland Code (2002, 2006 Cum. Supp.), § 8–301(b) of the Criminal Law Article (Cr).

Count 2 charged that Clark "did knowingly and willfully assume the identity of Kurt Schluntz" in violation of Cr § 8–301(c).

Count 3 charged that Clark did steal a Play Station 3 Game System and one game from Toys 'R' Us, Inc., valued at over $500, in violation of Cr § 7–104.

Count 4 charged that Clark did steal Schluntz's Sun Trust credit card, in violation of Cr § 8–204(a).

Count 5 charged that Clark "did unlawfully use and disclose a credit card number" of Schluntz, namely, that of the Sun Trust issued credit card, in violation of Cr § 8–214.

Count 6 charged attempted theft from Target of the television set, valued at over $500.

The court sentenced Clark on March 13, 2008, to five years on Count 1; to five years on Count 2, to be served concurrently with the sentence on Count 1; to fifteen years on Count 3, consecutive to the sentence on Count 2; to ten years on Count 4, consecutive to the sentence on Count 3; to fifteen years on Count 5, concurrent with the sentences on Counts 3 and 4; and to fifteen years on Count 6, to be served consecutively to

---

**4.** The State originally charged Clark by information with seventeen counts based on the above incidents and on two separate, prior incidents involving similar facts. On November 16, 2007, the court severed Counts 1 through 10 to be tried separately from Counts 11 through 17, which were the charges in the instant trial. At that trial, original Counts 11 through 17 were renumbered Counts 1 through 7, and we shall use the later numbering as well.

the sentences on Counts 1, 3, and 4. Thus, the sentences in the criminal cause before us total forty-five years.[5]

From the judgment of conviction, Clark appealed to this Court. Additional facts will be stated as necessary to the analysis of the issues presented.

## I

Clark asserts that there was insufficient evidence to support convictions on Count 1 (Cr § 8–301(b)), Count 2 (Cr § 8–301(c)), and Count 5 (Cr § 8–214). He labels the sections respectively as "Identity Theft," "Identity Fraud," and "Unlawful Disclosure of a Credit Card Number." He argues that the conduct proven should have been charged under Cr § 8–206(a)(1), which prohibits use of a stolen credit card. His theory is that the Identity Theft and Identity Fraud statutes, as well as Cr § 8–214, were enacted after the criminal proscription of using a stolen credit card and were intended to address conduct that was not reached by that pre-existing statute. Clark suggests, as examples of Identity Theft and Identity Fraud, using "the card to procure access to the victim's accounts or to create new lines of credit in the victim's name[.]" We shall address the none-too-clear interrelationship between the statutes, *infra*. But, first, the State presents the argument that this issue has not been preserved.

---

**5.** Clark pleaded guilty on December 12, 2007, to offenses in original Counts 1 through 10, including attempted theft over $500; identity theft; and theft over $500. He was sentenced to a total of thirty years on these counts, with all but ten years suspended. All sentences stemming from these guilty pleas run concurrently with the sentences in the cause before us.

The circumstances on which Clark's guilty pleas on these charges were based were as follows. Clark stole a woman's purse and used her credit cards in an attempt to obtain a PS3 game system and a game, valued at $660.44, on June 15, 2007, from the same Target store from which he attempted to obtain the Philips TV on June 25, 2007. One week later, Clark stole a credit card from another woman's purse and attempted to purchase a PS3 game system on June 22, 2007, from a Wal–Mart store. Clark was successful on this attempt, managing to obtain a PS3 game system and a game valued at $691.68.

■ Although Clark characterizes his argument as based on insufficient evidence, the argument essentially is that the facts proved by the State do not satisfy the elements of the crimes charged. In this respect, the preservation issue here is much like that presented in *Moosavi v. State,* 355 Md. 651, 736 A.2d 285 (1999). Moosavi was convicted for violating Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 151A, which criminalized circulating or transmitting a statement or rumor concerning the location or possible detonation of a bomb or other explosive device by one who knew the statement or rumor to be false and who intended that it be acted upon. Moosavi contended in the trial court that the appropriate charge was under Article 27, § 9, proscribing the threat to explode a destructive explosive device. He did not renew this argument in this Court. *Moosavi v. State,* 118 Md.App. 683, 703 A.2d 1302 (1998). This Court reasoned that Moosavi had been inappropriately charged, but affirmed because the issue had not been raised on appeal. The Court of Appeals considered the merits and reversed the conviction. It reasoned that, if § 151A were clearly inapplicable to Moosavi's conduct, then, even if counsel had not preserved the issue, Moosavi "would be entitled to relief in an appropriate post conviction proceeding collaterally attacking his conviction." 355 Md. at 662, 736 A.2d at 290–91 (citing *State v. Evans,* 278 Md. 197, 211, 362 A.2d 629, 637 (1976); *Franklin v. State,* 319 Md. 116, 122, 571 A.2d 1208, 1210–11 (1990); *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949, 951 (1985)). As a further reason for considering the argument, the *Moosavi* Court held that the conviction under an entirely inapplicable statute could be reviewed on the theory that the resulting sentence was illegal and therefore could be challenged at any time. *Id.* at 662, 736 A.2d at 291 (citing *Campbell v. State,* 325 Md. 488, 601 A.2d 667 (1992)). *See also Moore v. State,* 163 Md.App. 305, 313–14, 878 A.2d 678, 683 (2005). Thus, the issue is preserved.

In the case *sub judice,* the State, when addressing the merits, reviews the statutory language and the facts established at trial, and concludes that, under the rule of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d

560 (1979), any rational juror could have found guilt. Actually, the merits present a question of statutory construction.

The earliest of the statutes put in play by Clark's argument is Cr § 8–206, enacted by Chapter 632 of the Acts of 1972 and codified in Maryland Code (1957, 1976 Repl.Vol.) as Article 27, § 142A(d). Section 8–206, in relevant part, provides:

"(a) *Prohibited—Use of stolen or counterfeit card.*—A person may not for the purpose of obtaining money, goods, services, or anything of value, and with the intent to defraud another, use:

"(1) a credit card obtained or retained in violation of § 8–204 or § 8–205 of this subtitle. . . .

. . . .

"(a) *Same—False representation.*—A person may not, with the intent to defraud another, obtain money, goods, services, or anything of value by representing:

"(1) without the consent of the cardholder, that the person is the holder of a specified credit card[.]"

Section 8–204(a) provides, in relevant part:

"(a) *Taking credit card from another; receiving credit card taken from another with intent to sell.*—(1) A person may not:

"(i) take a credit card from another, or from the possession, custody, or control of another without the consent of the cardholder[.]"

Credit card is defined in Cr § 8–201(c) for the purpose of Cr Title 8, "Fraud and Related Crimes," Subtitle 2, "Credit Card Crimes." That subsection provides:

"(1) 'Credit card' means an instrument or device issued by an issuer for the use of a cardholder in obtaining money, goods, services, or anything of value on credit.

"(2) 'Credit card' includes:

"(i) a debit card, access card, or other device for use by a cardholder to effect a transfer of funds through an electronic terminal, telephone, or computer;

"(ii) a magnetic tape that orders or authorizes a financial institution to debit or credit an account; and

"(iii) a code, account number, or other means of account access that is not encoded or truncated and can be used to:

"1. obtain money, goods, services, or anything of value; or

"2. initiate a transfer of funds.

"(3) 'Credit card' does not include a check, draft, or similar paper instrument."

The core of Cr § 8–214 was enacted by Chapters 747 and 782 of the Acts of 1984, as part of then Article 27, § 145, a section renumbered by Chapter 849 of the Acts of 1978 from former § 142A. Section 8–214 is codified under Part II, "Credit Card Number Protection," of Subtitle 2 of Cr Article 8. In relevant part, the section reads:

"(a) *In general; exceptions.*—A person may not use or disclose any credit card number or other payment device number or holder's signature unless:

"(1) the person is the holder of the credit card number or payment device number;

"(2) the disclosure is made to the holder or issuer of the credit card number or payment device number;

"(3) the use or disclosure is:

"(i) required under federal or State law;

"(ii) at the direction of a governmental unit in accordance with law; or

"(iii) in response to the order of a court having jurisdiction to issue the order; or

"(4) the disclosure is in connection with an authorization, processing, billing, collection, chargeback, insurance collection, fraud prevention, or credit card or payment device recovery that relates to the credit card number or payment device number, an account accessed by the credit card number or payment account number, a debt for which the holder or a person authorized by the holder

gave the credit card number or payment device number for purposes of identification, or a debt or obligation arising, alone or in conjunction with another means of payment, from the use of the credit card number or payment device number[.]"

Section 8–301 had its genesis in Chapters 331 and 332 of the Acts of 1999. It is codified under Subtitle 3, "Identity Fraud," of Cr Article 8. As of June 25, 2007, § 8–301, in relevant part, provided:

"(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

"(2) 'Payment device number' has the meaning stated in § 8–213 of this title.

"(3) 'Personal identifying information' means a name, address, telephone number, driver's license number, Social Security number, place of employment, employee identification number, mother's maiden name, bank or other financial institution account number, date of birth, personal identification number, credit card number, or other payment device number.

"(b) *Prohibited.*—*Obtaining personal identifying information without consent.*—A person may not knowingly, willfully, and with fraudulent intent possess, obtain, or help another to possess or obtain any personal identifying information of an individual, without the consent of the individual, in order to use, sell, or transfer the information to get a benefit, credit, good, service, or other thing of value in the name of the individual.

"(c) *Same—Assuming identity of another.*—A person may not knowingly and willfully assume the identity of another;

. . . .

"(2) with fraudulent intent to:

"(i) get a benefit, credit, good, service, or other thing of

value[.]" [6]

## A

■ We shall first address Count 5. Cr § 8–214, subject to exceptions not relevant here, criminalizes the unauthorized use or disclosure of a credit card *number*. In this case, the conduct on which the State relied is not clear from the criminal information, other than that it relates to Dr. Schluntz's Sun Trust credit card. In its opening summation, the State reviewed the information count by count, consecutively, but omitted Count 5 in that review. The only reference in the State's argument to the disclosure of a credit card number is in its discussion of the attempted purchase at Target, using a Sun Trust card. The State said, in part:

> "The same credit card number was used. That in and of itself is using somebody else's credit card without permission. He presented it. Enough said? He presented it, he used it. He disclosed these credit card number [*sic*]. He had no permission to do that."

Thus, the theory of the State is that the presentation of a lost or stolen credit card in an attempted transaction discloses the credit card number and violates Cr § 8–214.

In each of the fourteen instances in Cr § 8–214 which use the term, "credit card," it is immediately followed by the term, "number." The plain language of the statute focuses on, and limits its concern to, credit card numbers. Further, presenting, for fraudulent purposes, a credit card (which would contain a credit card number) was conduct already criminalized by Code (1957, 1982 Repl.Vol.), Art. 27, § 145, (now uncharged § 8–206) when the provisions now found in § 8–214 were first enacted. Thus, from the statute as a whole, it would appear that Clark's conduct did not violate Cr § 8–214.

---

**6.** Cr § 8–213(e) defines "Payment device number" to mean "a code, account number, or other means of account access, other than a check, draft, or similar paper instrument, that can be used to obtain money, goods, services, or anything of value, or for purposes of initiating a transfer of funds."

In prosecutions under 15 U.S.C. 1644(a), generally prohibiting in interstate or foreign commerce the use of a stolen "credit card," courts have divided over whether the fraudulent use of the credit card number, without presenting the card itself, violates the statute. *Compare United States v. Callihan*, 666 F.2d 422, 423 (9th Cir.1982) ("[C]redit card account numbers are not the same as credit cards") *with United States v. Bice–Bey*, 701 F.2d 1086, 1092 (4th Cir.) (holding that the defendant's reading of the statute, as making the same distinction, was "overliteralistic"), *cert. denied*, 464 U.S. 837, 104 S.Ct. 126, 78 L.Ed.2d 123 (1983)

In *State v. Leyda*, 122 Wash.App. 633, 94 P.3d 397, 400 (2004), *rev'd in part on other grounds*, 157 Wash.2d 335, 138 P.3d 610 (2006), the court, rejecting a strict merger argument, said that "possession of a stolen credit card is not an element of identity theft; possession of a stolen credit card number would satisfy that statute."

If § 8–214 is ambiguous on whether the General Assembly intended by it to reach only unauthorized credit card number disclosures, which were made separately from use of the credit card itself, then we may consider the legislative history as an aid to construction. *See Ishola v. State*, 404 Md. 155, 945 A.2d 1273 (2008) (consulting legislative history of identity theft statute where it was unclear whether identity of "another" in Cr § 8–301(c) could include a fictitious person); *Melton v. State*, 379 Md. 471, 842 A.2d 743 (2004).

Cr § 8–214 was enacted in 1984 by Chapter 747 (Senate Bill 703) and Chapter 782 (House Bill 1590). Both bills added a new Subtitle 14, "Credit Card Number Protection Act," to Title 14, "Miscellaneous Consumer Protection Provisions," of the Commercial Law Article (CL). With one exception not here relevant, "the differences between chs. 747 and 782 are stylistic and consist of wording and labeling variances." Editor's Note to Maryland Code (2000 Repl.Vol.), § 14–1401 of the CL Article. Both statutes contained a criminal provision, codified as § 14–1403, and providing:

"A person may not possess, with unlawful or fraudulent intent, any credit card number or other payment device number belonging to another person[.]"

In Chapter 747, the word, "number", was inserted by amendment following "credit card" in this section. By Chapter 26 of the Acts of 2002, former CL § § 14–1401 through 14–1405 were repealed and reenacted as § § 8–213 through 8–217 of the Criminal Law Article, as part of the Code Revision Project.

Portions of the analyses for both 1984 bills are the same. They point out that "[g]enerally, current law prohibits the fraudulent use of credit cards which have been lost or stolen[.]" The "CHANGES MADE BY THE BILL[S]" are that they create "a new subtitle to address credit card number and payment device number protection." The background for the legislation is described in the favorable report of the Senate Judicial Proceedings Committee on House Bill 1590. The committee advised that, at its hearing, an assistant attorney general from the Consumer Protection Division

"testified that the AG's Office had recently been investigating 'telemarketing' firms. These firms would obtain a consumer's credit card number by purchasing a list of numbers. The firm would then call the consumer and ask whether the consumer wished to purchase their service. When a consumer would refuse their service, the firm would place a charge on that consumer's credit card account even though no service had been bought by the consumer.

"According to Mr. Abbott the lists of credit card numbers are obtained by hooking into the computer of a credit bureau; the lists are then sold in an underground market. However, the practice of selling the lists of numbers is not illegal; under Maryland law the credit card itself is protected (i.e.-laws prohibiting theft or forgery) but the card's number is not."

Thus, § 8–214 was aimed at persons who came into possession of a credit card number(s) with a fraudulent intent or who came into possession of the number(s) lawfully, but thereafter

formed a fraudulent intent. In either case, it was the fraudulent possession of a credit card number, as a number, that the General Assembly intended to reach. There was no intent to duplicate the existing crimes of stealing and then using a credit card. We hold that Clark did not violate § 8–214.

## B

The State's theory of the case on Count 1, violation of Cr § 8–301(b), is found in the final argument of the prosecutor where he said:

> "Count 1 is 'the defendant did commit identity fraud by obtaining personal identification information without consent.' Okay, certainly he obtained personal identification. Dr. Schluntz didn't give him permission to do this. He had Dr. Schluntz's credit card, no question. He even had his wallet, had the credit cards, was in Target using the credit cards.
>
> "So, Count 1 he's in possession of somebody else's identifying credit cards. So, he did, in fact, commit identity fraud by obtaining personal identification information without consent. That's Count 1."

Thus, the State considered that it had proven obtaining and possessing "personal identifying information," because Clark had the credit cards that were in the wallet that he stole.

▮ As of June 2007, "personal identifying information" was defined by the limited types of information specified in § 8–301(a)(3).[7] With the exception of a person's name, address, place of employment, mother's maiden name and date

---

7. When the General Assembly enacted the Criminal Law Article by Chapter 26 of the Acts of 2002, as part of the Code Revision Project, the Code Revision Commission affixed a special Revisor's Note to § 8–301. It pointed out that Chapter 26 used the word, "means," in § 8–301(a) that limited "personal identifying information" to the material listed. The Commission suggested, for consideration of the General Assembly, changing "means" to "includes," "thus allowing other such information to be covered by this section without requiring further legislation." The General Assembly adopted this suggestion and made that change by Chapter 447 of the Acts of 2007, effective October 1, 2007.

of birth, each of the items of information specified in the statute is an identifying number of some kind. With respect to credit cards, the "personal identifying information" is not the credit card, it is the credit card number. There is no evidence that Clark obtained or possessed any personal identifying information of Dr. Schluntz in order to obtain something of value, other than his obtaining and possessing the victim's credit card, that contained a credit card number.[8] Thus, application of § 8–301(b) to the facts of the instant matter presents the same problem of construction of an ambiguous statute that we faced with respect to Cr § 8–214. Is presenting a credit card, embossed with a credit card number, the use of a stolen credit card under § 8–206, or is it the fraudulent use of a type of personal identifying information, *i.e.*, a credit card number, under § 8–301(b)? As we explain below, it is both. We again consult the legislative history.

Section 8–301 was enacted by Chapter 331 of the Acts of 1999 (Senate Bill 244) and Chapter 332 (House Bill 334). The statement of the legislative committee of the Maryland Chiefs of Police Association to the Senate Judicial Proceedings Committee on Senate Bill 244 clearly states the purpose of the legislation.

> " 'Identity theft' is becoming a serious problem for Maryland residents. Identity thieves use another person's personal identifiers such as name, address, Social Security

---

**8.** Although Clark obtained a number of pieces of identification, containing Dr. Schluntz's name, when he stole Dr. Schluntz's wallet, the evidence does not reflect that he used any item of identification in the transaction or attempted transaction at Toys 'R' Us and Target, other than a credit card.

A person's name is "personal identifying information" under § 8–301(a)(3), but Clark did not use that information to get something of value. Schluntz's credit cards, as described in the testimony, are third-party issuer cards. In that transactional format, the merchant is relying on the credit of the third-party issuer who, in turn, relies on the credit of the cardholder. This is not a case in which Clark went into Toys 'R' Us or Target and *expressly* identified himself as Dr. Schluntz in order to charge to an account in the name of Dr. Schluntz that had been established directly between him and the merchant, which had made its own evaluation of Dr. Schluntz's credit.

number, date of birth, mother's maiden name, financial account numbers, credit card numbers, and PIN numbers. This information is used to take over existing accounts or open new credit card or financial accounts. These thieves obtain money, goods, and services and leave the victim to straighten out the mess as the thief moves to another victim.

. . . .

"... Current theft laws do not cover the theft of personal information as it has no set value and does not fit the definition of property as defined in Article 27, Crimes and Punishments, § 340."

Similarly, in written testimony on House Bill 334, the Maryland State's Attorney's Association advised as follows:

"Members of the Association are receiving an ever-increasing number of complaints from citizens of unauthorized use of their personal identifying information by unscrupulous individuals who fraudulently use their identity to obtain credit, goods, and services and then not pay for it. The unsuspecting citizen whose identity has been used is the one who is sued or pressured for non-payment of the bill.

"Many times, the victim doesn't even find out about the problem—which can ruin their credit—until years later when they go to sell their house or engage in some other credit transaction that necessitates obtaining a copy of their credit report. Then, they discover to their horror that they owe money all over the State, for transactions they had nothing to do with.

. . . .

"Most of the time, we have to decline prosecution because there is no statute that criminalizes the fraudulent use of someone's identity. Although the crime of theft would apply if it is the merchant or bank that is complaining, there is no crime when it is the defrauded individual who complains. Many times, the merchant, bank or other business entity that has suffered a loss as a result of identity fraud, does *not* press charges or even report the crime. They

simply write it off as part of the cost of doing business. However, to pay for the resulting losses, they increase their fees and prices—which ends up hurting all consumers.

"What we are asking you to do is to give the true victims of this crime a voice. The people whose credit and reputation has [*sic* ] been ruined by unscrupulous individuals who up until now have been getting a free ride at the expense of innocent people."

The fact that Clark's conduct falls within the prohibition of Cr § 8–206 does not, under the legislative history here, reflect an intent that § 8–301(b) was not to apply as well in those instances in which the statutes overlap. The earlier statute, § 8–206, proscribing use of a stolen credit card, viewed the defrauded merchant as the principal victim. Where a merchant has honored a stolen credit card, a cardholder who has taken reasonable steps to notify the card issuer of the theft has no liability in excess of $50. See 15 U.S.C. § 1643, first enacted October 26, 1970, by Pub.L. 91–508. Cr § 8–301 is concerned with the credit history of the cardholder and aims to prevent or reduce the grief to the cardholder arising out of identity fraud.

The legislative intent in enacting § 8–301 is manifested by subsection (g), which provides:

"A sentence under this section may be imposed separate from and consecutive to or concurrent with a sentence for any crime based on the act or acts establishing the violation of this section."

Thus, the fact that § 8–301(b) may overlap with § 8–206 in some instances does not reflect a legislative intent that fraudulent use of a credit card number to obtain something of value, when that number is embossed on a credit card that is presented in the transaction, is excluded from prosecution under Cr § 8–301(b).

## C

Count 2 charged that Clark assumed the identity of Dr. Schluntz in violation of Cr § 8–301(c). The State's theory on

this count was set forth in the following portion of the prosecutor's jury summation.

"Count 2, 'Did the defendant commit identity fraud by assuming the identity of another?' When you go up to the counter at Target and you are asked to pay for something and you drag up a television, a 32–inch television that's worth $839 they ask you to tender some money and you present them with Kurt Schluntz's credit card—right there you're guilty. That doesn't work, well let's give them another credit card of Kurt Schluntz's, doesn't work? Let's give them another card, credit card of Kurt Schluntz's.

"Who is he pretending to be? He's not pretending to be [the prosecutor]. He's not pretending to be James Clark. He's assumed the identity of Kurt Schluntz. He, for those few minutes, is pretending, 'Hi, I'm [Kurt Schluntz]. I work at, here's Sun Trust. Oh, matter of fact these are the credit cards I use. Here's Sun Trust. I'm [Kurt Schluntz].' "

In *Ishola v. State,* 404 Md. at 165–66, 945 A.2d at 1279, the Court of Appeals concluded from the legislative history "that the information that an individual is prohibited from obtaining in § 8–301(b) is the same information he or she is prohibited from using in § 8–301(c)." That case was an appeal from a conviction under Cr § 8–301(c), prohibiting, for fraudulent purposes, a person from assuming "the identity of another." In an attempt to open a bank account, Ishola presented as identification a Florida driver's license in the name, " 'Christopher J. Pitera.' " Although it had conducted an investigation, the State introduced no evidence that Christopher J. Pitera was a living person. Ishola contended that the statute did not include the assumption of the identity of a fictitious person, but this Court held that "another" embraced both fictitious and real persons. *Ishola v. State,* 175 Md.App. 201, 927 A.2d 15 (2007). The Court of Appeals held that the term, "another," was ambiguous and applied aids to construction, including legislative history. That review indicated that the purpose of subsections (b) and (c) of § 8–301 was the same. Thus, for the reasons given in Part I.B, above, we reject the argument that

§ 8–206 is the exclusively applicable prohibition for conduct embraced by § 8–301(c).

Clark argues that § 8–301(c) is not violated unless the defendant uses personal information of the victim "to obtain credit, open a new account, or access existing accounts." In support of this argument, he cites *United States v. Hawes*, 523 F.3d 245, 250–51 (3d Cir.2008); *United States v. Oates*, 427 F.3d 1086 (8th Cir.2005), and *United States v. Williams*, 355 F.3d 893 (6th Cir.2003). These cases involve applications of a sentencing enhancer under the federal sentencing guidelines. That sentencing enhancer is now found at 1 Federal Sentencing Guidelines Manual (2008 ed.), § 2B 1. 1(b)(10)(C)(i) (USSG). The guidelines provide for a two level increase where the conviction was for, *inter alia*, theft or fraud,

> "[i]f the offense involved ... (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification[.]"

In the commentary to 1 USSG § 2B 1. 1, the Background for subsection (b)(10)(C) states that it

> "implements the directive to the Commission in section 4 of the Identity Theft and Assumption Deterrence Act of 1998, Public Law 105–318. This subsection focuses principally on an aggravated form of identity theft known as 'affirmative identity theft' or 'breeding', in which a defendant uses another individual's name, social security number, or some other form of identification ('the means of identification') to 'breed' (*i.e.* produce or obtain) new or additional forms of identification."

1 USSG at 99–100. Cr § 8–301(c) contains no limitation similar to the limitation on enhancement for identity theft under the federal sentencing guidelines.

■ Ordinarily, when a person tenders a stolen credit card to a merchant as payment for goods or services, the person so presenting implicitly represents that he or she is the cardholder. The statute contains no minimum period of time during which that misrepresentation must be maintained. *See United States v. Hanson*, 2009 WL 2460887, 2009 U.S. Dist.

LEXIS 69435 (D.C.C.D.Cal.2009) (stating, as to each instance in which the defendant presented a fraudulently obtained American Express credit card in payment for limousine services, that the defendant "falsely claimed" that he was the cardholder).

## II

■ Clark next contends the trial court imposed an improper sentence. In support, he offers three distinct doctrines: the rule of lenity and fundamental fairness, the single larceny rule, and the constitutional prohibition against cruel and unusual punishment. The State contends these arguments were not properly preserved because they were never argued in the lower court. *See* Maryland Rule 8–131(a) (2008). The sentencing transcript confirms this assertion. Because we conclude that part of the sentence is illegal, it may be corrected at any time. Maryland Rule 4–345(a). That illegality leads us to exercise our discretion to review the entire sentence. *See Office of the Governor v. Washington Post Co.,* 360 Md. 520, 532 n. 3, 759 A.2d 249, 256 n. 3 (2000) (holding that, "because the second sentence of [Maryland Rule 8–131(a) ] begins with the word '[o]rdinarily,' both the Court of Special Appeals and this Court each have independent discretion to excuse the failure of a party to preserve an issue for appellate review.")

## A

■ The sentence on Count 4 exceeds the maximum allowable sentence by eight years and six months. Count 4, as amended by interlineation, charged that Clark had taken the Sun Trust card of Dr. Schluntz. That is the gist of the offense proscribed by Cr § 8–204(a)(1)(i) that is referenced in the information. The maximum sentence for violation of § 8–204 is eighteen months imprisonment. Clark was sentenced to ten years on Count 4, consecutive to the fifteen year term of confinement for theft of the Play Station system from Toys 'R'

Us in violation of Cr § 7–104, that was charged in Count 3.[9]

**B**

Clark submits that we should merge sentences under the doctrine of lenity. He acknowledges that the required evidence test under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is not applicable here. The merger, as Clark sees it, is between the identity theft charges under § 8–301, subsections (b) and (c) on the one side, and the theft charges in § § 7–104 and 8–204 (Counts 3 and 4), together with the attempted theft charged in Count 6, on the other side.[10] In support of his position, Clark cites *Moore v. State*, 163 Md.App. 305, 878 A.2d 678 (2005). Moore had been convicted of theft of less than $500 in violation of Cr § 7–104, based on stealing credit cards, and with theft of credit cards in violation of Cr § 8–204. This Court held that the convictions should have merged under both the required evidence test and the rule of lenity.

The Court of Appeals described the rule of lenity in *Monoker v. State*, 321 Md. 214, 222, 582 A.2d 525, 529 (1990), where it stated:

"Even though two offenses do not merge under the required evidence test, there are nevertheless times when the offenses will not be punished separately. Two crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence. It is when we are uncertain whether the legisla-

---

**9.** Cr § 8–206 prohibits a person, with intent to defraud another, from using a credit card obtained or retained in violation of § 8–204. The maximum sentence under § 8–206, where the value obtained exceeds $500, is fifteen years. Obtaining something of value by use of a stolen credit card is a substantively different offense from stealing the card itself, but the State did not charge such use of the card in Count 4, or, indeed, in the criminal cause before us.

**10.** As he propounded it, Clark's argument included with the identity theft crimes (§ 8–301), the violation of § 8–214 under Count 5. In view of our holding in Part I.A, we need not include § 8–214 in our discussion.

ture intended one or more than one sentence that we make use of an aid to statutory interpretation known as the 'rule of lenity.' Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge."

The Supreme Court has emphasized " 'that the "touchstone" of the rule of lenity "is statutory ambiguity." ' " *Albernaz v. United States*, 450 U.S. 333, 342, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) (quoting *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980)). With respect to determining ambiguity, the Court has also stated:

> " 'Where Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent.' [*Bifulco*, 447 U.S. at 387, 100 S.Ct. at 2252]. Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one. The rule comes into operation 'at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' *Callanan v. United States*, [364 U.S. 587,] 596[, 81 S.Ct. 321, 326–27[5 L.Ed.2d 312] (1961) ]."

*Id.* at 342, 101 S.Ct. at 1144. *See also State v. Ferrell*, 67 Md.App. 631, 508 A.2d 1023 (1986), *aff'd*, 313 Md. 291, 545 A.2d 653 (1988).

■ Here, the identity theft and identity fraud violations do not merge with the theft violations because the General Assembly has clearly declared its intent in Cr § 8–301(g) ("A sentence under this section may be imposed separate from and consecutive to or concurrent with a sentence for any crime based on the act or acts establishing the violation of this section.").

Thus, *Moore* is inapplicable because neither criminal statute argued in that case contained an anti-merger provision.

## C

Clark next contends that the identity theft convictions should merge with the theft convictions under the single

larceny doctrine. That concept was explained most recently by the Court of Appeals in *Kelley v. State*, 402 Md. 745, 939 A.2d 149 (2008):

> " '[T]he stealing of several articles *at the same time*, whether belonging to the same person or to several persons, constituted but one offense.' " (Emphasis added). The rationale for that ruling was as follows:
>
>> " 'It is but one offense because the act is one continuous act,—the same transaction; and, the gist of the offense being the felonious taking of the property, we do not see how the legal quality of the act is in any manner affected by the fact that the property stolen, instead of belonging to one person, is the several property of different persons.' "

*Id.* at 750, 939 A.2d at 152 (quoting *State v. Warren*, 77 Md. 121, 122, 26 A. 500, 500 (1893)).

The chronological order of the crimes involved in this argument would be, first, obtaining the credit cards (§ 8–301(b)) and theft of the Sun Trust card (§ 8–204), second, theft of the Play Station System at Toys 'R' Us (§ 7–104), and assuming Dr. Schluntz's identity (§ 8–301(c)), and, third, the attempt to steal the television at Target, in violation of the common law and § 7–104, and assuming Dr. Schluntz's identity (§ 8–301(c)). Each of the three theft episodes occurred on a separate occasion, involved separate victims, and presents a separate unit of prosecution. The additional convictions for identity theft and fraud do not cause a merger, under the single larceny concept, because of the anti-merger provision of Cr § 8–301(g). The common law concept of a single larceny does not overrule the statute.[11]

---

11. The anti-merger statute, § 8–301(g), does not operate within § 8–301. Clark does not argue, however, that Count 1 (§ 8–301(b)) and Count 2 (§ 8–301(c)) merge; but the five year sentences on those counts run concurrently with each other.

Courts have held that, within the various ways that an identity theft statute may be violated, the unit of prosecution is the initial offense, together with all subsequent proscribed conduct involving use of the same victim's identifying information, *see Washington v. Leyda*, 157

In addition, the identity theft statute contains a variation on the single larceny doctrine, but it is designed to increase punishment and not to achieve lenity. Cr § 8–301(d)(5) provides:

"(5) When the violation of this section is pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one violation and the value of the benefit, credit, goods, services, or other thing of value may be aggregated in determining whether the violation is a felony or misdemeanor.

### D

Clark asserts that his sentence to forty-five years imprisonment violates the Eighth Amendment's prohibition against "cruel and unusual punishment" and the prohibition of Article 25 of the Maryland Declaration of Rights against "cruel or unusual punishment." [12] Clark's position is that his sentence violates the proportionality element of those constitutional protections. The submission invokes a two-step analysis. First, we must "determine whether the sentence appears to be grossly disproportionate." *Thomas v. State*, 333 Md. 84, 95, 634 A.2d 1, 6 (1993). If so, then we should "engage in a more detailed *Solem* [*v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ] type analysis." *Id.* As explained below, we find that Clark's sentence, which we have reduced to no more than thirty-six and one-half years, does not appear grossly disproportionate. Thus, Clark's argument does not clear the first step of the analysis.[13]

---

Wash.2d 335, 138 P.3d 610, 616 (2006); or that identity theft is a continuing offense, *see Kansas v. Meza*, 38 Kan.App.2d 245, 165 P.3d 298 (2007); *Ex parte Egbuonu*, 911 So.2d 748 (Ala.Crim.App.2004); and *Wisconsin v. Ramirez*, 246 Wis.2d 802, 633 N.W.2d 656 (2001).

**12.** In *Thomas v. State*, 333 Md. 84, 103 n. 5, 634 A.2d 1, 10 n. 5 (1993), the Court of Appeals perceived "no difference between the protection afforded" by the federal and state constitutional provisions.

**13.** In his brief, Clark has not presented any data in support of the second step of the analysis, *i.e.*, data designed to demonstrate that his

In *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court reviewed its 1983 decision in *Solem v. Helm, supra*, on which Clark heavily relies, together with *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), and concluded that the "precise contours" of the gross disproportionality principle "are unclear [and] applicable only in the exceedingly rare and extreme case." 538 U.S. at 73, 123 S.Ct. at 1173 (internal quotes and attributions omitted). The precise issue in *Lockyer* was whether, under 28 U.S.C. § 2254(d)(1), a federal court could issue a writ of habeas corpus on the ground that the upholding by a state court of Andrade's sentence, against an Eighth Amendment challenge, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States."

Andrade was sentenced under the California multiple offender statute to twenty-five years to life for the theft of videotapes valued at $84.70 and to a *consecutive* sentence of twenty-five years to life for a separate theft of four videotapes of the total value of $68.84. A jury found that the predicate convictions were three residential burglaries for which he had been sentenced in 1982 to ten years imprisonment. His record also contained a misdemeanor theft conviction in 1982, a 1988 conviction for transporting marijuana, and two 1990 convictions, one for petty theft and the other for transporting marijuana. The Court considered the "length of sentence and availability of parole, severity of the underlying offense, and the impact of recidivism," *id.* at 73, 123 S.Ct. at 1173, and the "broad discretion" that the Eighth Amendment gives legislatures "to fashion a sentence that fits within the scope of the

---

sentence is, in fact, grossly disproportionate. This violates Maryland Rule 8–504(a)(4) and (5). Because of this violation, we would be justified in refusing to consider the argument. *See Abrams v. Lamone*, 398 Md. 146, 158 n. 16, 919 A.2d 1223, 1229 n. 16 (2007); *Oak Crest Village, Inc. v. Murphy*, 379 Md. 229, 241, 841 A.2d 816, 823 (2004); *Honeycutt v. Honeycutt*, 150 Md.App. 604, 618, 822 A.2d 551, 559, *cert. denied*, 376 Md. 544, 831 A.2d 4 (2003).

proportionality principle." *Id.* at 76, 123 S.Ct. at 1175. The Court held that the state court had not unreasonably applied clearly established Supreme Court law in concluding that Andrade's sentence was not cruel and unusual.

In *Thomas,* 333 Md. 84, 634 A.2d 1, the Court of Appeals focused on similar factors when it stated:

> "[T]he court should look to the seriousness of the conduct involved, the seriousness of any relevant past conduct as in the recidivist cases, any articulated purpose supporting the sentence, and the importance of deferring to the legislature and to the sentencing court."

*Id.* at 95, 634 A.2d at 7.

Clark's sentence of thirty-six and one-half years consists of fifteen years for the theft over $500 from Toys 'R' Us; fifteen years for the attempted theft of a television set, valued at over $500, from Target; five years for the theft of Dr. Schluntz's identifying information and for assuming his identity; and eighteen months for the theft of Dr. Schluntz's Sun Trust card. As we have modified the sentence, each component is within the maximum penalty deemed appropriate by the General Assembly. More significant to the issue before us is that the original sentence of forty-five years for these multiple offenses was within the sentencing guidelines, the object of which is to achieve some degree of proportionality in criminal sentencing. Further, at sentencing, the State noted that Clark had over thirty adult convictions, most of which related to theft schemes. He had spent twenty-seven years in the Department of Corrections.

The prosecutor also referred to a case that he had handled against Clark some four years before sentencing. In that case, Clark had

> "recruited a young female who was a heroin addict, and the information that we had, in which she plead guilty to, he was giving her heroin to assist her in stealing laptops and computers and breaking into office buildings throughout Maryland, Prince George's and Montgomery County."

In his allocution, Clark admitted that he is a heroin addict. He said:

"Doing prison time is not [a] problem to me, I don't have no problem in a penitentiary. I can function in a penitentiary. There's a problem once I get released. I have a hard time functioning in society."

Under all of the circumstances here, there is no apparent gross disproportionality.

## III

Clark contends that the judge erred in failing to merge his convictions for theft over $500 and for credit card theft. He alleges that due to an ambiguity in the jury instructions, the jury could have based both convictions on the single act of stealing one of Kurt Schluntz's credit cards because the credit limit may have exceeded $500. No objection to the jury instructions was made at trial regarding these two counts. Therefore, the issue has not been preserved.

For the foregoing reasons, we enter the mandate set forth below.

**JUDGMENT OF CONVICTION ON COUNT 5, REVERSED. SENTENCE ON COUNT 4 REVERSED, AND CASE REMANDED FOR RESENTENCING ON THAT COUNT. IN ALL OTHER RESPECTS, THE JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY ARE AFFIRMED.**

**THREE-FOURTHS OF THE COSTS TO BE PAID BY APPELLANT; ONE-FOURTH OF THE COSTS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND.**