RICHARD von LUSCH *v.* STATE OF MARYLAND

[No. 1069, September Term, 1977.]

*Decided June 9, 1978.*

518

The cause was argued before MORTON, MOYLAN and COUCH, JJ.

*Philip W. Moore* for appellant.

*W. Timothy Finan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, J. Owen Wise, State's Attorney for Caroline County,* and *John T. Clark, III, Assistant State's Attorney for Caroline County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Richard von Lusch, felt aggrieved by a form of nuisance wrought initially by Orville and Wilbur Wright but inflicted ultimately upon him as traffic in and out of a local airport flew low over his Queen Anne's County home. The redress he sought, unfortunately, was by way of invoking another nuisance wrought initially by Alexander Graham Bell and inflicted ultimately upon Julius Grollman, a neighbor of the appellant and a Queen Anne's County Commissioner responsible in part for the presence of the airport which was the source of the appellant's chagrin. The protracted zoning dispute which brought the appellant and Mr. Grollman to loggerheads is fully recounted in *von Lusch v. Board of County Commissioners of Queen Anne's County,* 268 Md. 445, 302 A. 2d 4, and *von Lusch v. Board of County Commissioners of Queen Anne's County,* 24 Md. App. 383, 330 A. 2d 738. The latest chapter of this contretemps was written

by a Caroline County jury, presided over by Judge K. Thomas Everngam, which found the appellant guilty of two counts of making repeated telephone calls with intent to annoy and harass in contravention of Article 27, Section 555A. Upon this appeal, the appellant raises essentially four contentions:

1) That Article 27, Section 555A, is unconstitutional;

2) That he should not have been convicted of two separate offenses in that both merge into a single course of repetitive conduct;

3) That the court erroneously declined to give certain jury instructions requested by the appellant; and

4) That pen register evidence was erroneously admitted.

## I. The Pen Register Evidence

We deal initially with the contested pen register evidence. A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the phone is released. It does not overhear oral communications and does not indicate whether calls are actually completed. In this case, Leroy Fisher, the Commercial Manager of the Chesapeake and Potomac Telephone Company of Chestertown, testified that the telephone company is a private corporation. He testified that one of C. & P.'s subscribers, Julius Grollman, had complained of receiving harassing telephone calls. Mr. Fisher testified that he ordered his employees to place a pen register upon the appellant's telephone in order to corroborate the customer's complaint about having received repeated calls from the appellant. The pen register revealed, *inter alia,* that 43 calls were placed from the appellant's telephone to Mr. Grollman's telephone within a 7-hour period on May 5, 1974, one of the dates as to which a conviction was returned. The appellant's attack upon the pen register is twofold and neither is availing.

## A. A Pen Register is Not Covered by Title III

Whatever doubt may once have existed, it is now clear that the purely mechanical act of dialing a particular number as revealed by a pen register is not a "communication" within

the contemplation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.[1] This issue was laid finally to rest by the Supreme Court on December 7, 1977, by its decision in *United States v. New York Telephone Company,* 434 U. S. 159, 98 S. Ct. 364, 54 L.Ed.2d 376. The Supreme Court there pointed out, at 54 L.Ed.2d 386:

> "Title III is concerned only with orders 'authorizing or approving the *interception* of a wire or oral communication....'" ... Congress defined 'intercept' to mean 'the *aural* acquisition of the *contents* of any wire or oral *communication* through the use of any electronic, mechanical, or other device.' ... Pen registers do not 'intercept' because they do not acquire the 'contents' of communications, as that term is defined by 18 USC §2511(8)... Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed — a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed are disclosed by pen registers. Furthermore, pen registers do not accomplish the 'aural acquisition' of anything. They decode outgoing telephone numbers by responding to changes in electrical voltage caused by the turning of the telephone dial (or the pressing of buttons on push button telephones) and present the information in a form to be interpreted by sight rather than by hearing."

See *United States v. Giordano,* 416 U. S. 505, 553-554, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974) (concurring opinion by Powell, J., joined in by three other justices). And see also *United States v. Illinois Bell Telephone Co.,* 531 F. 2d 809 (CA7 1976); *United States v. Southwestern Bell Telephone Co.,* 546 F. 2d 243 (CA8 1976); *United States v. Falcone,* 505 F. 2d 478 (Ca3

---

1. 18 United States Code, §§ 2510-2520.

1974), *cert. denied,* 420 U. S. 955, 43 L.Ed.2d 432, 95 S. Ct. 1338, 1339 (1975); *Hodge v. Mountain States Telephone and Telegraph Co.,* 555 F. 2d 254 (CA9 1977); *United States v. Clegg,* 509 F. 2d 605, 610 n. 6 (CA5 1975). The ultimate holding of the Supreme Court in *United States v. New York Telephone Company,* 54 L.Ed.2d at 387, could not have been more unequivocal:

> "It is clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications and did not intend to impose Title III restrictions upon their use."

## B. Fourth Amendment Inapplicability to Private Persons or Private Corporations

We will assume, without deciding, that the placing of a pen register upon a telephone and the identification of outgoing calls is a search and seizure within the contemplation of the Fourth Amendment. To bring the conduct within the compass of the Fourth Amendment, however, is not necessarily to bring the actors within the compass of the Fourth Amendment. It is clear that the command of the Fourth Amendment to be "reasonable" is addressed to government as government and not to private persons. This very fundamental threshold question has a way of being frequently overlooked.

The Fourth Amendment is but a part of the Bill of Rights and the entire Bill of Rights is, by definition, a set of limitations upon government as government. To acknowledge that the Bill of Rights is inapplicable for their correction is not to condone private wrongs. There are many mansions in our law and we look to different ones for different redresses. We are protected from each other's depredations by the traditional substantive law, civil and criminal, which we have erected over the centuries to regulate man's interrelationships with other men. It was in the very act of ratifying a new social contract in 1788 that we perceived the need for a set of fundamental protections against the

proposed new government even as we were already protected against each other by an already venerable substantive law. The Bill of Rights, in response to that felt need, was a set of built-in limitations, of hobbles, upon government as government. The addition of the Fourteenth Amendment to the first ten only lengthened the list of governments whose agents are regulated. The sanction now applies not to the agents of one government but to the agents of fifty-one governments. It is still, however, limited to governmental agents. If it were otherwise, it would cease to be a Bill of Rights and would become a code of substantive law.

This basic truth was recognized initially by the Supreme Court in *Burdeau v. McDowell,* 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921). In dealing with an unconscionable search and seizure but with one that lay beyond the coverage of the Fourth Amendment, the Supreme Court well articulated the limits of the Bill of Rights in regulating human behavior, saying at 256 U. S. 475:

> "The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies ...
>
> In the present case the record clearly shows that no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of the Cities Service Company. It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another."

The vitality of *Burdeau v. McDowell* was attested as late

as 1971 by *Coolidge v. New Hampshire,* 403 U. S. 443, 487, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971):

> "Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. Cf. *Burdeau v. McDowell.* . . ."

On that particular point, Justice Stewart spoke for a unanimous Supreme Court. See also *United States v. Goldberg,* 330 F. 2d 30 (3d Cir. 1964); *United States v. McGuire,* 381 F. 2d 306 (2d Cir. 1967); *United States v. Mekjian,* 505 F. 2d 1320 (5th Cir. 1975). This fundamental principle was recognized by this Court in *Herbert v. State,* 10 Md. App. 279, 269 A. 2d 430 (1970), speaking through Judge Orth at 10 Md. App. 284-285:

> "We believe that by history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action. Whatever wrong is done by the act of one individual in taking the property of another, it is no invasion of the security afforded by the Fourth Amendment against unreasonable searches and seizures. *Burdeau v. McDowell. . . .* When an individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial."

In this case, it was undisputed that the Chesapeake and Potomac Telephone Company was a private corporation. A complaint was lodged with that corporation by one of its subscribers. In response to that complaint, Leroy Fisher, the Commercial Manager of the corporation, ordered that the pen

register be placed on the appellant's telephone. The placing of the pen register was already *fait accompli* long before any investigative arm of the sovereignty became remotely aware of its existence. There was simply no "state action" such as is required even to engage the gears of the Fourth Amendment, the Fourteenth Amendment or the Exclusionary Rule.

## II. The Constitutionality of Section 555A

Article 27, Section 555A, provides:

> "It is unlawful for any person to make use of telephone facilities or equipment . . . (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons;"

The appellant recognizes as he must that this statute is facially constitutional. In *Caldwell v. State,* 26 Md. App. 94, 337 A. 2d 476, Judge Thompson thoroughly analyzed the section and explicitly found it to be constitutional. He pointed out how the specific intent "to annoy, abuse, torment, harass, or embarrass" saved the statute from any danger of being "void for vagueness." The appellant now attempts to engraft onto the statute an additional requirement that the intent "to annoy, etc." be the "sole" intent possessed by the telephoning party. The language of the statute does not contain such an additional requirement and the definitive interpretation of the intent requirement in *Caldwell v. State, supra,* does not hint at such an additional requirement. The one case cited by the appellant of *United States v. Darsey,* 342 F. Supp. 311 (E.D. Pa. 1972), is of no assistance in interpreting our statute. The *Darsey* case, to be sure, refers to the fact that in the case before it the repeated phone calls must be made "solely to harass." *Darsey,* however, dealt with a conviction under United States Code, Title 47, Section 223(1)(d), where the statutory language itself required that the harassing phone calls of an interstate nature be placed by one who "makes repeated telephone calls . . . solely to harass any person at the called number." The statutory limitation dealt with in that case is simply not present in the Maryland statute.

The appellant makes the additional argument that *Caldwell v. State* to the contrary notwithstanding, Section 555A is unconstitutional because of the chilling effect it may have upon the First Amendment. The argument misperceives the values protected by that amendment. The right to express ideas does not include the right to impose the communication of those ideas upon an unwilling listener. *Cantwell v. Connecticut,* 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). The Maryland statute does not prohibit speech or communication as such. It simply protects one from the harassment and annoyance of having his own telephone used in an abusive fashion by an unwanted intruder upon his privacy. Citizens have a right to speak. Citizens also have a right not to be forced to listen. Freedom of speech does not encompass the right to abuse the telephone with the specific intent to annoy and to harass the recipient of the call. *Caldwell v. State, supra.*

## III. Do Two Convictions Constitute Double Jeopardy?

The appellant takes umbrage at having been convicted upon two counts — charging violations of the statute on May 5 and May 11 respectively — rather than upon a single count. The appellant points out, quite properly, that under the statute, each individual call is not a distinct offense. The statute is aimed rather at a pattern of "repeated calls." What he fails to perceive is that even patterns (each embracing a complex of individual calls) may be in the plural. The evidence here was legally sufficient to establish one pattern of repetitive calls on May 5 and again a distinct and separate pattern of repetitive calls on May 11.

The appellant made a distinct flurry of calls on May 5. Forty-three calls were placed within a seven-hour period. Ten of them actually reached Mr. Grollman. The appellant admitted that he dialed Mr. Grollman 43 times on May 5. He would announce to Mr. Grollman the time of day and would then "yell" out, "Flight overhead." The appellant admitted that he knew that Mr. Grollman had a heart condition and that he (the appellant) "had hoped to wear him down."

A distinct episode occurred on May 11, six days later. The calls were made on weekends. The appellant did not bother to see Mr. Grollman personally even though he lived but a block and a half away. He did not call Mr. Grollman at the Commissioner's Office in the Court House during the working week. The May 5 calls were all made to Mr. Grollman's residence. The May 11 calls were made to Mr. Grollman at the store which adjoined his home. On May 11, fourteen calls were received by Mr. Grollman in one 25-minute period.

The episodes were distinct and we perceive no error.

### IV. Jury Instructions

The jury instructions actually given adequately and fairly set forth the applicable law. That is all that is required. *Bartholomey v. State,* 260 Md. 504, 532, 273 A. 2d 164. The appellant had no right to the exact language (much of it slanted, rhetorical and argumentative) of his requested instructions. *England v. State,* 21 Md. App. 412, 320 A. 2d 66; *Nelson v. State,* 5 Md. App. 109, 245 A. 2d 606.

*Judgments affirmed; costs to be paid by appellant.*