REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1410

September Term, 2013

MICHAEL ANTHONY JOHNSON

v.

STATE OF MARYLAND

Meredith,
Woodward,
Friedman,

JJ.

Opinion by Woodward, J.

Filed: May 31, 2016

Michael Johnson, appellant, was convicted by a jury in the Circuit Court for Prince George's County of one count of stalking, ten counts of reckless endangerment, two counts of harassment, ten counts of harassment by electronic mail ("email"), and fifty counts of violating a protective order. As a result, the court imposed concurrent and consecutive sentences which, in the aggregate, totaled eighty-five years and ninety days' imprisonment.

On appeal, appellant raises the following questions,[1] which we have slightly reworded:

    1.    Did the trial court err by failing to merge appellant's ten convictions for email harassment under Section 3-805 of the Criminal Law Article, which punishes a "course of conduct"?

    2.    Did the trial court err by failing to merge appellant's fifty

---

[1] Appellant's questions as stated in his brief are:

    1.    Under Md. Code Ann., Criminal Law, §3-805, which punishes a "course of conduct," must appellant's ten convictions for email harassment merge?

    2.    Whether appellant's fifty convictions for violating a protective order covering conduct on nine separate days, that resulted in fifty separate one-year consecutive sentences, must merge based on the day each occurred?

    3.    Whether appellant's convictions for reckless endangerment by posting material on Craigslist.com must merge when the two convictions could have been based on the same conduct?

    4.    Did the trial court err by permitting the victim to testify in rebuttal to details of an assault for which appellant was not on trial?

    5.    Did the trial court err in admitting printouts of emails the victim said were sent by appellant?

convictions for violating a protective order into nine convictions, based on conduct occurring on nine separate days?

3.    Did by trial court err by failing to merge two of appellant's reckless endangerment convictions based on the conduct of posting material to Craigslist.org?

4.    Did the trial court err by permitting the victim to testify in rebuttal to appellant's prior convictions of assault and violation of a protective order?

5.    Did the trial court err in admitting printouts of emails the victim said were sent by appellant?

For the following reasons, we shall answer these questions in the negative and, accordingly, affirm the judgments of the circuit court.

## BACKGROUND

Angell Williams and appellant were married and in 2010 had a son together; they separated in the summer of 2010 and divorced in September 2011. In July 2010, Williams obtained a protective order against appellant. On February 27, 2011, appellant was arrested for violating the protective order. Appellant went to jail, but was released the same night. On February 28, 2011, appellant attacked Williams as she was getting into her car; he was arrested for second degree assault, found guilty of violating the protective order and assaulting Williams, and sentenced to a year of imprisonment.

On June 20, 2012, Williams could not log into her MSN email account. When she tried to reset her password, she noticed that the recovery email address listed was not hers, but instead was that of Mikejohnson516@yahoo.com, appellant's email address. That same

2

day, three to four men came to Williams's home and said they were responding to a sex ad on Craigslist. One such man showed Williams the ad on his phone; the ad contained old pictures of Williams, her name and address, as well as an invitation for men to come to Williams's home and have sex with her. Williams, who had not placed the ad, called 911. The police came to her home, but said that there was nothing they could do without proof of who created the ad.

On June 21, 2012, Williams received messages from several of her friends on Facebook, asking Williams why she created another Facebook page. Williams went on Facebook and saw the new page, which, like the Craigslist ad, contained old pictures of Williams, as well as her address and prices listed for various sex acts. Williams recognized that the pictures were from her hacked MSN email account. Also on June 21, 2012, Williams received an email message from Gmail notifying her that she had attempted to reset the password for her email account. Williams notified Gmail that she had not attempted to reset her password. On June 21, 2012, approximately forty men came to Williams's home in response to sex ads. One of these men showed her the Craigslist ad to which he was responding. The ad read:

> This is real, rape me. I want some guys to knock on my door. When I open it, smack me, push me down, rip my panties off, fuck me and leave me. No talking, just rape me and go. If your [sic] down, no emails, just come over, 7300 18th Ave, Apartment 202, Hyattsville, Maryland 20783, map quest it and come on over. Real men step up.

On June 23, 2012, as men were still coming to Williams's home, Williams received

3

emails from Mikejohnson516@yahoo.com, appellant's email account. The first email read: "You having fun yet." Williams replied: "Stop[] sending people to my house to have sex with my kids and me. That's solicitation." Appellant responded, "Don't know what you're talking about, but maybe we can work something out so I can make it stop for you." Williams responded, "Maybe your probation officer can help me;" a condition of appellant's probation was to have no contact with Williams. Appellant replied:

> 301-699-3644, Agent Jones, call when you're ready, don't see how that will stop your problem since I heard your address is posted on a lot of adult websites; and I think I could help you get them down. But, if I'm not here, maybe they will stay up there. Whoever put them up there must not know it's some crazy people out there. Be safe from leaving your house. Hope nobody hangs around, but, like I said, maybe we can work something out.

The email exchanges continued; that same day, Williams filed a petition for a protective order against appellant and received a temporary protective order. She also called 911 and gave the police who responded a copy of the temporary order. The police said that they would attempt to serve appellant with such order.

Williams received another email from appellant on June 24, 2012, which read:

> Your life wasn't meant to be normal. You can try to be something you're not, but your life has never been normal for 32 years, so why do you think it's going to change. It's okay to lie to other people like your life is something it's not, but what about yourself? It will always catch up to you. This is how your life has been and always be. Love always, bye Big Head.

Men were still coming to Williams's home at all hours of the day and night. Williams would tell the men that the ads were fake and ask what website had posted the ad; then she

4

would contact that website and ask it to take down the ad.    One ad posted on Blackplanet.com read:

> Hello, I'm Angell.  I'm looking for sex and sex only.  I swallow.  I do anal and groups up to five guys at once.  If you're not in Maryland, DC or Virginia, please don't bother me.  If you do live in the DMV, holla at your girl with that wet-wet and sloppy head.  I live in Riggs Hill Condos, so if you close by, hit me up.

Williams called 911 again on June 26, 2012, in an attempt to put a stop to the men responding to the ads.  The police advised her to press charges for violation of a protective order, which she did the next day.

On June 29, 2012, the circuit court held a hearing on the final protective order. Williams showed the court the emails and ads.  The court granted the final protective order and ordered appellant to not have any contact with Williams.

On July 6, 2012, as men were still coming to Williams's home, Williams received an email from riffraffshawn@yahoo.com. Williams had a friend with the stage name of Riffraff Shawn that appellant knew, but Williams and Shawn never exchanged emails.   The email said: "It will be about 25-40 folks comin over between now and Saturday, so keep doin you and givin your number out and suckin and fuckin.  I will have you workin in no time." A few hours later, Williams received a second email from the same address; it read: "Get a hotel room tomorrow and I will meet you there.  Fuck me the whole day and it will stop. Don't and there will be no peace for you.  I will have folks comin over there until you move."

5

Williams, who suspected that the emails were coming from appellant, replied to the e-mail in the hopes that appellant would identify himself, and to figure out "how he could be set up" so that police could arrest him. Williams also called the police to ask them for help in catching appellant; she suggested that the police "book the hotel room and have him go there an[d] arrest him." The police told Williams to file charges, which she did that day. Williams also bought a shotgun to protect herself and her four children from appellant.

Williams received additional emails from the riffraffshawn@yahoo.com address on July 9, with further demands that Williams meet him at a hotel room. Williams replied, "Sure. I'll do it. I don't have a credit card or debit card though." Although Williams had no intentions of meeting him, she had hoped that appellant would stop posting the ads, as men were still coming to her home.

On July 13, 2012, Williams received an email from the riffraffshawn@yahoo.com email address with a new ad. The ad, which contained the same old photos of Williams that were from her hacked MSN email account, as well as her address, read: "Come over, looking for good dick." That same day, Williams received additional emails from the riffraffshawn@yahoo.com email address pressuring her to meet him at a hotel. When Williams refused, she received the following response: "It's cool. I'm going on the kids['] school website and post your ad for sex since it don't matter." Williams received another email on July 13 with the post on the school website, which contained the same pictures and read:

6

Hi, my name is Angell Mary Williams. I'm the mother of [AC] and [CC] and I will have sex with there [sic] teachers in return for them getting passing grades. It can be for however long they attend the school and they get passing grades. I live at 7300 18th Avenue, Apartment 202, Hyattsville, MD 20783, and have done this at all there [sic] other schools and don't mind doing it here as well. Thank you, and hope we have a great year together.

On July 14, Williams received the following email:

To whom may read this, the part of the investigation that leads to read this, I'm not sorry for the events that happened to Ms. Williams. All the chances to not let it get this far, but she refused to, so her blood is not on my hands. She should have known by now that all she had to do was one thing, and she played a joke with her own life. I know that you're reading this after the fact and look at me as a monster, but maybe she wanted it this way. That's why she chose to play with her life. That being said, I want to say good-bye to my mother and father and kids. I love them very much. I was a man pushed into this, pushed to do this. I hope Angell's mom will take care of her kids after this; and I hope they will grow up and not make the same mistakes. Your life is not a game because you should always do all you can do. Too bad Angell didn't. Bye.

Williams continued to receive emails from the riffraffshawn@yahoo.com email address on July 16, 2012, again pressuring Williams to book a hotel room and then threatening to kill her. One email read:

The best part about it is with all the people coming to your house at random, you don't know when it will be me. I started this plan a long time ago. The people in the building know all about the traffic you have had, people outside yelling your name. They open the door for folks so when I come, it won't even look strange, walk right up and kick the door in and you'll see the rest.

Another email read:

I want to leave you alone and would have if you had got the room.

7

And yes, I have changed. That's why I'm trying to give you a chance, but I know you think I'm joking or just trying to bully you, but you **will know that I'm for real when I tie you up and fuck you in the ass with a broom stick. I'm not going to just kill you, but put you through pain first.** That's how I know the police will kill me because I'm going to take my time with you, but enough with all the talk. See you soon. It's okay. I don't expect to live through this anyway.

(Emphasis added).

Williams received another email that read: "I love it when I have the chance to prove my point. I swear on my grandmother's grave you will die. You can believe me or not unless your baby is superman and can stop bullets. See you soon." Williams received another email that day that read: "You'll wish you was back in your childhood getting raped, the things I'm going to do to you, then leave your dead raped body in the woods." Williams called the police on July 16, 2012, after receiving an e-mail that stated "that he was outside my house . . . come on to the balcony, I'll shoot you from there."

Williams received additional emails from the riffraffshawn@yahoo.com email address on July 17, 2012. One such email contained a video of someone being raped; the message read: "You should let the girls watch this so they will know what they got coming." Later that day, Williams received another email asking: "Are the girls there? I could have them cherries busted before you get back." On July 17, men were still coming to Williams's home "at the same frequency" as they had earlier in the summer.

On July 18, 2012, Williams received more emails from the riffraffshawn@yahoo.com email address; one such email referred to Williams as "Big Head," appellant's nickname for

8

Williams, and was signed "Love you always, Your Mike."

On July 19, 2012, Williams received an email from the riffraffshawn@yahoo.com email address that referred to Williams as "the mother of my child." Another email Williams received that day from the riffraffshawn@yahoo.com email address contained an ad with the same photos and Williams's address, which read: "I'm a single parent looking to make some extra cash. I swallow. I do anal and groups." The email stated: "I have printed out 250 of those and will be passing them all over the DMV, putting them in barber shops, metro stations, malls, gas stations, office buildings, strip clubs, so be ready." Around fifty men came to Williams's home on July 19.

On July 22, 2012, Williams received another email from the riffraffshawn@yahoo.com email address that read: "I'm going to honk the horn. I'm in the red truck." At that point, Williams, who was inside her apartment, heard a horn honk. She went down to the landing of her apartment building and saw a red truck but could not see the driver's face; Williams called 911. The police arrived and arrested the man in the truck, who was not appellant.

According to Williams, approximately 400 men, "maybe more," came to her home between June 20 and July 22, 2012. Men came every single day during that span of time, and they would arrive at all hours of the day and night. Williams received no additional emails from the riffraffshawn@yahoo.com email address after early August 2012.

On August 1, 2012, Prince George's County police officers executed a search warrant

for appellant's mother's home, which was the physical address associated with the IP address for the riffraffshawn@yahoo.com email account. The police seized multiple computers, along with photo identifications of appellant, one of which was from the Maryland National Capitol Park and Planning Commission. Appellant was not present at the time of the search.

Appellant was arrested on August 14, 2012. A jury trial was held in the circuit court from June 10 through June 12, 2013. As previously stated, the jury convicted appellant of one count of stalking, two counts of harassment, ten counts of harassment by electronic mail, ten counts of reckless endangerment, and fifty counts of violating a protective order. On July 18, 2013, the court sentenced appellant to a total of eighty-five years and ninety days' incarceration, broken down as follows:

- 1 count of stalking: 5 years, with credit for 351 days served
- 1 count of harassment: 90 days, consecutive
- 1 count of harassment: 90 days, concurrent
- 4 counts of reckless endangerment: 5 years, consecutive
- 6 counts of reckless endangerment: 5 years, concurrent
- 10 counts of harassment by electronic mail: 1 year, consecutive
- 50 counts of violating a protective order: 1 year, consecutive

Appellant filed a timely appeal on August 5, 2013. Additional facts will be presented as necessary to resolve the questions presented.

## DISCUSSION

### I. Merger of Email Harassment Convictions

Appellant asserts that, because the statute prohibiting email harassment was amended

10

in 2012 to add the language "course of conduct," and his ten convictions were part of a single course of conduct, those convictions must merge. He contends, therefore, that the ten separate consecutive sentences he received for such convictions were illegal and necessitate a remand of his case for resentencing.

The State responds that the email harassment statute's unit of prosecution "is each series of acts over time that shows a continuity of purpose to annoy or alarm, that occurs after the person has been warned or asked to stop." According to the State, "the sending of each series of harassing emails is a separate crime." The State notes that the statute is modeled after the telephone misuse statute, and that this Court held that each of two separate incidences of repeated telephone calls constituted a distinct pattern of conduct.

"The court may correct an illegal sentence at any time." Md. Rule 4-345(a). The Court of Appeals has noted that

> "[w]e have consistently defined this category of 'illegal sentence' as limited to those situations in which the illegality inheres in the sentence itself; *i.e.*, there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful."

*Bryant v. State*, 436 Md. 653, 662-63 (2014) (quoting *Chaney v. State*, 397 Md. 460, 466 (2007)). Specifically, a court's failure to merge a sentence renders the sentence or sentences actually imposed "illegal." *Pair v. State*, 202 Md. App. 617, 624 (2011) ("A failure to merge a sentence is considered to be an 'illegal sentence' within the contemplation of [Rule 4-345]." (citation omitted)).

11

Appellant was convicted under the 2012 version of the email harassment statute, Md. Code (2002, 2012 Repl. Vol., 2015 Cum. Supp.), § 3-805 of the Criminal Law Article ("CL") which provides:

> (a) *Definitions.*— (1) In this section the following words have the meanings indicated.
>
> (2) "Electronic communication" means the transmission of information, data, or a communication by the use of a computer or any other electronic means that is sent to a person and that is received by the person.
>
> (3) "Interactive computer service" means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including a system that provides access to the Internet and cellular phones.
>
> (b) *Prohibited*—(1) A person may not maliciously engage in a course of conduct, through the use of electronic communication, that alarms or seriously annoys another:
>
>> (i) with the intent to harass, alarm, or annoy the other;
>>
>> (ii) after receiving a reasonable warning or request to stop by or on behalf of the other; and
>>
>> (iii) without a legal purpose.
>
> (2) A person may not use an interactive computer service to maliciously engage in a course of conduct that inflicts serious emotional distress on a minor or places a minor in reasonable fear of death or serious bodily injury with the intent:
>
>> (i) to kill, injure, harass, or cause serious emotional distress to the minor; or
>>
>> (ii) to place the minor in reasonable fear of death or serious bodily injury.

12

This Court considered the merger of convictions under a prior version of the email harassment statute in *Donati v. State*, 215 Md. App. 686, *cert. denied*, 438 Md. 143 (2014). The earlier version of the statute did not contain language referring to the prohibited acts as "a course of conduct." Nevertheless, Donati argued that "the unit of prosecution is the pattern of harassing e-mails, not the individual e-mails, and therefore, the circuit court imposed an illegal sentence by imposing separate, consecutive sentences for each conviction." *Id*. at 723 (internal quotation marks omitted). In support of his argument, Donati contended, as appellant does here, "that amendments to C.L. § 3-805 in 2012, which explicitly prohibit a course of conduct, show the original intent that the unit of prosecution for email harassment is . . . a pattern of harassment." *Id*. (internal quotation marks omitted). We rejected Donati's argument, holding that the unit of prosecution was each email sent. We explained:

> Pursuant to the language of the statute, the unit of prosecution is "*the transmission of information or a communication*." Neither of these terms are defined in the statute, so we look to the dictionary definitions of these terms.
>
> Transmission is defined as "an act, process, or *instance* of transmitting." Communication is defined as "an act or instance of transmitting," "information communicated," and "a verbal or written message." **Both terms contemplate one instance, i.e., a singular act.**
>
> **When the General Assembly intends to make the unit of prosecution a course of conduct, it has made that intent clear. For example, two statutes in effect at the time the email statute was enacted in 1989 specifically referred to "repeated calls" or a "course of conduct." The legislature did not use this language in**

13

> **the statute prohibiting harassment by electronic mail.**
>
> We agree with the State that the language of the statute here is unambiguous. Accordingly, it is not appropriate to infer a different meaning based on the legislative history.

*Id*. at 724-25 (bold emphasis added) (footnote omitted) (citations omitted).

As appellant correctly points out, the General Assembly added the language "a course of conduct" to the statute in 2012. 2012 Md. Laws, Chap. 42. Appellant thus argues that the statute as amended changes the unit of prosecution from each email sent to a "course of conduct." Appellant's argument still fails, because each of appellant's ten email harassment convictions corresponds to each day that appellant sent a series of emails to Williams, thus constituting a separate course of conduct on each such day. We shall explain.

*Donati* makes clear that the email harassment statute was modeled after the telephone misuse statute. *Id*. at 726. This Court has held that the telephone misuse statute, despite its prohibition of "repeated calls," allows for multiple convictions based on multiple, but distinct, series of "repeated calls." *See von Lusch v. State*, 39 Md. App. 517, 525-26, *cert. denied*, 283 Md. 740 (1978). Writing for this Court in *von Lusch*, Judge Charles Moylan, Jr. wrote:

> **The appellant takes umbrage at having been convicted upon two counts—charging violations of the statute on May 5 and May 11 respectively—rather than upon a single count. The appellant points out, quite properly, that under the statute, each individual call is not a distinct offense. The statute is aimed rather at a pattern of "repeated calls." What he fails to perceive is that even patterns (each embracing a complex of individual calls) may be in the plural. The evidence here was legally**

14

**sufficient to establish one pattern of repetitive calls on May 5 and again a distinct and separate pattern of repetitive calls on May 11.**

The appellant made a distinct flurry of calls on May 5. Forty-three calls were placed within a seven-hour period. Ten of them actually reached Mr. Grollman. The appellant admitted that he dialed Mr. Grollman 43 times on May 5. He would announce to Mr. Grollman the time of day and would then "yell" out, "Flight overhead." The appellant admitted that he knew that Mr. Grollman had a heart condition and that he (the appellant) "had hoped to wear him down."

A distinct episode occurred on May 11, six days later. The calls were made on weekends. The appellant did not bother to see Mr. Grollman personally even though he lived but a block and a half away. He did not call Mr. Grollman at the Commissioner's Office in the Court House during the working week. The May 5 calls were all made to Mr. Grollman's residence. The May 11 calls were made to Mr. Grollman at the store which adjoined his home. On May 11, fourteen calls were received by Mr. Grollman in one 25-minute period.

**The episodes were distinct and we perceive no error.**

*Id*. (emphasis added).

In the case *sub judice*, appellant was convicted of ten counts of violating the e-mail harassment statute for emails he sent to Williams on ten different days: June 24, July 6, July 9, July 13, July 14, July 16, July 17, July 18, July 19, and July 22, 2012. Unlike Donati, appellant was not convicted of violating the statute for each email that he sent to Williams. *See Donati*, 215 Md. App. at 722-23. Similar to von Lusch's distinct episodes of "repeated calls" on two different days, each day that appellant harassed Williams via a series of emails constituted a distinct "pattern" or course of conduct in violation of the e-mail harassment

15

statute. *See* CL § 3-805; 39 Md. App. at 525-26. As a result, the circuit court properly imposed separate sentences for each of appellant's convictions for e-mail harassment.

## II. Merger of Convictions for Violating a Protective Order

Appellant contends that,"because the jury instructions and verdict sheet created ambiguity" with respect to the conduct upon which the jury relied in convicting him of fifty counts of violating a protective order, appellant's fifty convictions must merge into no more than nine for sentencing purposes, one for each day on which a violation of a protective order was found to have occurred. He asserts that, under the rule of lenity, the ambiguity with respect to the basis for the jury's verdicts must be resolved in his favor, and thus a remand of his case is required, with instructions that he be resentenced to no more than one year of imprisonment per day on which a violation of a protective order was committed.

As an initial matter, the State responds that appellant failed to preserve this issue for appellate review, because, although appellant "argued that the violations should be limited by the days charged and not the number of emails, he did not assert as a basis for his claim that the [ ] jury's verdict was unclear." On the merits, the State argues that upon consideration of (1) the verdict sheet, (2) the trial court's instructions to the jury, and (3) the prosecutor's closing argument, the jury's verdicts were not ambiguous, and thus appellant "is not entitled to the benefit of an ambiguity."

We first conclude that appellant's issue is preserved, because, at the sentencing hearing, defense counsel raised the issue of the merger of the violation of protective orders

16

for each of the nine days for which the jury convicted appellant. Although defense counsel did not utter the words "rule of lenity," he clearly preserved the issue of merger of the convictions for violation of the protective order, and the trial court clearly decided the issue when it stated: "I don't believe that anything technically merges. . . . Each violation of the protective order was exactly that, a separate and distinct email that occurred over the course of those eight [sic] days." Because the issue was raised in and decided by the trial court, the issue is preserved for our review. *See* Md. Rule 8-131(a).

There are three grounds on which an individual's convictions may be merged for sentencing purposes: "(1) the required evidence test; (2) the rule of lenity; and (3) 'the principle of fundamental fairness.'" *Carroll v. State*, 428 Md. 679, 693-94 (2012) (quoting *Monoker v. State*, 321 Md. 214, 222-23 (1990)). Appellant concedes that the required evidence test is not applicable in this case.

With respect to the purpose and applicability of the rule of lenity, the Court of Appeals has explained:

> Two crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence. It is when we are uncertain whether the legislature intended one or more than one sentence that we make use of an aid to statutory interpretation known as the rule of lenity. Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge.

*Clark v. State*, 188 Md. App. 185, 207-08 (2009) (quotation marks omitted) (quoting *Monoker*, 321 Md. at 222).

17

The Court of Appeals stated in *Nicolas v. State*, 426 Md. 385, 408 n.6 (2012):

> As Maryland case law indicates, the appropriate standard to apply when addressing a question of factual ambiguity in the context of merging convictions is to resolve the ambiguity in the defendant's favor in a situation where it is impossible to know for certain the rationale of the trier of fact for finding the convictions entered against the defendant.

*See also Snowden v. State*, 321 Md. 612, 619 (1991); *State v. Frye*, 283 Md. 709, 723-25 (1978); *Cortez v. State*, 104 Md. App. 358, 361 (1995). Because "[t]he burden of proving distinct acts or transactions . . . falls on the State," "when the indictment or jury's verdict reflects ambiguity as to whether the jury based its convictions on distinct acts, the ambiguity must be resolved in favor of the defendant." *Morris v. State*, 192 Md. App. 1, 39 (2010). Courts have looked to the charging document, jury instructions, verdict sheet, and evidence introduced at trial to determine whether ambiguity existed. *See id*. at 39-44.

We agree with the State that the record in the instant case is not ambiguous. First, the trial court explained the verdict sheet to the jury as follows:

> All right. Mr. Foreman, ladies and gentlemen, this case involves five different types of crime. However, you will receive a verdict sheet that has a total of 81 questions. The reason for that is **there are charges that certain crimes were repeated multiple times over the course of certain days. So, I think the verdict sheet is very logical. It starts with the offenses that cover the span of time between June 1st and July 22nd; and then it goes in chronological order for the dates the State alleges the Violations of the Protective Order**, the Harassment, and Harassment by Electronic Mail.

(Emphasis added).

18

In addition, the court instructed the jury that the verdict sheet included several counts charging the same crimes because "certain crimes were repeated multiple times" and that the jury "must consider each charge separately and return a separate verdict as to each charge."

Then, in her closing argument, the prosecutor explained:

> Now July 6th, we've gotten the Protective Order. Questions 22 through 38, they're all charges of violating the Protective Order. You will see when you go through these email chains—it is important when you go through these chains to look at the emails. If you look at the times they're sent, they are in there duplicate times. Some emails you are going to read, you look at times because sometimes when a reply is sent, it attaches that older email with it. **So you want to go through and really sort out how many emails the defendant actually sent because he only gets charged one time per email.** Okay.
>
> My count, I came up with 23 emails were sent that day when you go through the counts and the types of emails. There are 23 emails sent on July 6th. **Remember I said before for each email you find, one emails equals one count of guilty for Violation of a Protective Order.** So, he sent 23.
>
> You are going to see he has 17 charges on that day for violating the Protective Order. So, if you find, yes, he sent all 23, you can't find him guilty of 23 counts because we've only charged 17. But, if you all agree that he sent all 23 of those emails on July 6th, then he's guilty of all 17. If you say, no, we only think he sent 16 of these emails, then he's guilty of 16 counts of violating the Protective Order and not guilty of one count on July 6th.
>
> ***
>
> On July 9th he sent five emails that day. Questions 40 and 41 go to violating a Protective Order. He has a total of two charges for violating the Protective Order on July 9th out of the five emails, same logic. If you find he sent two of the five emails, he's guilty. If you find he sent all five of the emails, he's guilty of both counts of

19

violating the Protective Order. If you find he only sent one, then he's only guilty of one. If he [sic] find he sent none, no emails, then he can't be guilty.

***

July 13th, questions 43 and then 45 to 51 go to violating the Protective Order for a total of eight charges. Eighteen emails sent that day from Riffraffshawn. Same logic, if you find he sent all 18, then clearly he's guilty of the eight. The only way he would not be guilty of all of those counts is if you find he sent less than eight emails that day . . . .

July 14th, same theme going here. Question 52 applies to Violation of a Protective Order. One charge you find he sent at least one email that day, and I show that he sent two, he's guilty of one count of violating the Protective Order. Same thing on July 16th, the Violation of Protective Order applies to Count 54. Then 56 through 63 of your verdict sheet, sent 23 emails that day, charged nine times. If you think he sent everything, then he's guilty of all of the counts because they exceed nine. If you think he sent at least nine, he's still guilty of all of the counts. He only starts becoming not guilty of some of those counts if you find that he did not send nine emails on the 16th. . . .

July 17th, same thing, six emails, four charges. As long as you find he sent at least four emails or more, he's guilty of all the charges. . . . Same thing on July 18th. For this one, he sent four emails. He has four charges. So, to find him guilty of all the counts, you have to find that he sent all four emails that day, same thing for July 19th.

Now, July 22nd, this is the day he sent the email, I'm coming in the red truck. I'm outside. I'll honk my horn. He sent one email. He's charged with one email. If you find he sent that email, he's guilty of that count of violating a Protective Order. That's question 80 on your verdict sheet.

(Emphasis added).

20

We conclude that the jury's verdicts were not ambiguous, because the verdict sheet, coupled with the trial court's instructions regarding the verdict sheet and the prosecutor's closing argument, made clear that each violation of the protective order corresponded to each email sent by appellant to Williams. In its instructions regarding the verdict sheet, the court stated that "certain crimes were repeated multiple times over the course of certain days." The prosecutor supplemented the court's instruction when she stated that, "for each email you find, one emails equals one count of guilty for Violation of a Protective Order." The prosecutor then explained to the jury that, if on a particular day the jury found that appellant sent more emails than the number of charges for violation of a protective order, appellant would be guilty of only the number of charges. Conversely, according to the prosecutor, if the jury found that appellant sent fewer emails than those charged, appellant would be guilty of only the number of emails sent on that day and not guilty of the remainder of the charges for that day. Therefore, because the jury's verdicts were not ambiguous, the court did not err in declining to merge appellant's fifty convictions into nine for sentencing purposes. *See Morris*, 192 Md. App. at 39.

### III. Merger of Reckless Endangerment Convictions

Appellant argues that his two convictions related to posting information on Craigslist.org, with Williams as the victim, should merge, because the relevant entries on the verdict sheet, Counts 11 and 20, were ambiguous in that they asked "Is the defendant . . . not guilty or guilty of the [r]eckless [e]ndangerment of [Williams] between June 1, 2012 and

July 22, 2012, to wit: by posting information about [Williams] on Craigslist.com?" Appellant contends that, due to the wording of the verdict sheet, there is no way of knowing "which conduct the jury relied upon for each conviction, whether different jurors relied on different Craigslist ads, or whether they even considered different ads for the two convictions." Moreover, appellant insists that the corresponding jury instruction on reckless endangerment did not add any clarity. Accordingly, appellant contends that, where the noted portions of the verdict sheet and jury instructions did not indicate the distinction between the conduct to be considered for the two charged offenses of reckless endangerment related to posting on Craigslist with Williams as the victim, those convictions "must now merge."

Again, the State responds that this argument is not preserved, because appellant "did not object when the court imposed separate sentences on counts eleven and twenty and he did not argue that the sentences should merge based upon an ambiguity in the record." As for the merits of appellant's claim, the State argues that the basis for the jury's verdict on these two counts is clear, because, as was true for the convictions for the violation of the protective order, the record shows that "no reasonable jury deliberating on the reckless endangerment counts charging [appellant] with the posting of the Craigslist ads could have found him guilty of both counts eleven and twenty on the basis of the same posting." (Footnote omitted).

As a preliminary matter, we conclude that appellant's argument is preserved, because, at the sentencing hearing, defense counsel stated:

22

Secondly, as to the reckless endangerment charges. We would argue that at least the two Craig'slist [sic] postings which were filed in this case, which is six of the reckless charges, should merge into three as well.

The language of the indictment states for Angell from June 1st to July 22nd. It does not specific [sic]—the indictment does not specify that there were two separate instances, it just discusses the language saying this was one course of action over this timeframe. It is basically duplicitous language for both of the charges. It is our argument that they should merge into three separate charges.

Because defense counsel raised the argument that the two charges of reckless endangerment based on the Craigslist ad should merge, the issue is preserved for our review. *See* Md. Rule 8-131(a).

Turning to the merits, we agree with the State that the two convictions for reckless endangerment based on the Craigslist ads were based on two distinct acts and thus were not ambiguous. First, we look to the charging document to determine whether there was any ambiguity regarding the factual basis for the Craigslist ad charges. *See Morris*, 192 Md. App. at 39 ("Accordingly, *when the indictment* or jury's verdict *reflects ambiguity* as to whether the jury based its convictions on distinct acts, the ambiguity must be resolved in favor of the defendant."(emphasis added)); *see also Gerald v. State*, 137 Md. App. 295, 312 (2001) ("*With an ambiguity in the indictment*, and non-curative instructions, the first degree assault conviction must indeed merge into the robbery conviction." (emphasis added)); *Williams v. State* 187 Md. App. 470, 477 (2009) ("*[Defendant's] charging document is ambiguous* as to the particular act for which he was charged with first degree assault of

23

[victim]. Moreover, the court did not instruct the jury as to "how the assault and robbery charges related to one another, how they differed, and what the jury needed to find to convict under both charges." (quoting *Gerald*, 137 Md. App. at 312)).

The language in the charging document makes clear that appellant was charged with two counts of reckless endangerment based on conduct related to two different Craigslist ads:

COUNT 11

THE GRAND JURORS OF THE STATE OF MARYLAND FOR THE BODY OF PRINCE GEORGE'S COUNTY ON THEIR OATH DO PRESENT THAT **MICHAEL ANTHONY JOHNSON, II** ON OR ABOUT THE 1st DAY OF JUNE, 2012, THROUGH THE 22ND DAY OF JULY, 2012, IN PRINCE GEORGE'S COUNTY, MARYLAND, DID RECKLESSLY ENGAGE IN CONDUCT, TO WIT: POSTING MATERIAL OF ANGELL WILLIAMS ON CRAIGSLIST.COM *INVITING MEN TO COME OVER TO HER RESIDENCE TO ENGAGE IN SEX AND/OR SEXUAL ACTS* WITH ANGELL WILLIAMS AND/OR HER DAUGHTERS THAT CREATED A SUBSTANTIAL RISK OF DEATH OR SERIOUS PHYSICAL INJURY TO ANGELL WILLIAMS., IN VIOLATION OF CR-03-204(a)(1) OF THE CRIMINAL LAW ARTICLE AGAINST THE PEACE, GOVERNMENT AND DIGNITY OF THE STATE. **(RECKLESS ENDANGERMENT)**

\*\*\*

COUNT 20

THE GRAND JURORS OF THE STATE OF MARYLAND FOR THE BODY OF PRINCE GEORGE'S COUNTY ON THEIR OATH DO PRESENT THAT **MICHAEL ANTHONY JOHNSON, II** ON OR ABOUT THE 1st DAY OF JUNE, 2012, THROUGH THE 22ND DAY OF JULY, 2012, IN PRINCE GEORGE'S COUNTY, MARYLAND, DID RECKLESSLY ENGAGE IN CONDUCT, TO

24

WIT: POSTING MATERIAL OF ANGELL WILLIAMS ON CRAIGSLIST.COM *INVITING MEN TO COME OVER TO HER RESIDENCE AND RAPE ANGELL WILLIAMS AND HER DAUGHTERS* THAT CREATED A SUBSTANTIAL RISK OF DEATH OR SERIOUS PHYSICAL INJURY TO ANGELL WILLIAMS, IN VIOLATION OF CR-03-204(a)(1) OF THE CRIMINAL LAW ARTICLE AGAINST THE PEACE, GOVERNMENT AND DIGNITY OF THE STATE. **(RECKLESS ENDANGERMENT)**

(Bold emphasis in original) (italics and underline added).

Second, as stated previously, the trial court's instructions regarding the verdict sheet indicated that the reckless endangerment charges corresponded to distinct acts or conduct engaged in by appellant. In its instructions regarding the verdict sheet, the court stated that "certain crimes were repeated multiple times over the course of certain days."

Third, the prosecutor stated the following in her closing argument:

> **On June 20th**, first the victim finds out that her MSN account is changed to—the backup email is changed to the mikejohnson516@yahoo.com. When you take a look at that, you'll see in the evidence there's actually a chart that confirms that after she fixed it; and it shows that they were removing the Mikejohnson516. We know that's the defendant's email account. He told us that. Then a man shows up. **This is the day they start showing up. A man shows up at her house. He says that he has found a Craigslist ad. That one you won't see. This is just from the testimony of Ms. Williams.** She testified that she saw the ad. He showed her on his phone. **It was basically some vulgar language about sex acts that supposedly had been her offering to perform to these men she didn't know.** She said the pictures were definitely her, but she did not put the posting up. The victim calls 911 because this is going on.

\*\*\*

25

**The 22nd**, men are showing up at her house. At this point, she said it was just continuance [sic]. Men are continuously coming to her house. **One of the men comes up again, says there's a Craigslist posting.**[2] **This posting you will see. It's in evidence. On this it's basically saying this is real, rape me. It is a rape fantasy. Take a look at that evidence. It goes through. It asks people who responded to just kick in the door, don't talk to her, just come in and rape her. Men are responding to this. They're showing up at her home, her home where she's at with her four children.**

(Emphasis added).

The prosecutor's closing argument thus tracked the language in the indictment and made it clear to the jury that Williams was being charged with reckless endangerment based on two different Craigslist ads: the first one, which was shown to Williams on June 20, 2012, but was not in evidence, and the second one, which was shown to Williams on June 21, 2012, and was in evidence. Moreover, the prosecutor's remarks were based on Williams's own testimony: she testified that she was shown the first ad on June 20, 2012, which said "come over and have sex with me." This Craigslist ad corresponds with Count 11, where appellant was charged with recklessly engaging in conduct by "posting material and information of [ ] Williams on Craigslist.com *inviting men to come over to her residence to engage in sex and/or sexual acts*." (Emphasis added). Later on, Williams testified that she was shown a Craigslist ad on June 21, 2012; she read from the ad, which described a rape fantasy: "this is real rape me." This ad, which was in evidence, corresponds with Count

---

[2] Williams testified that she was shown this ad on June 21, 2012, not June 22, 2012.

26

20, where appellant was charged with recklessly engaging in conduct by "posting material and information of [ ] Williams on Craigslist.com *inviting men to come over to her residence and rape [ ] Williams and her daughters.*" In sum, (1) the charging document clearly delineated two separate counts associated with conduct related to two distinct Craigslist ads; (2) the jury instructions emphasized that each charge corresponded to a distinct act; (3) there was an evidentiary basis for the jury to convict appellant of reckless endangerment of Williams based on two distinct Craigslist ads; and (4) such basis was explained to the jury by the prosecutor. As a result, the two convictions related to posting information on Craigslist.org, with Williams as the victim, were not ambiguous. Accordingly the circuit court did not err in declining to merge those two convictions for sentencing purposes. *See Morris*, 192 Md. App. at 39.

### IV. Appellant's Prior Convictions

*(A) Rebuttal Testimony*

Appellant contends that the court erred by allowing Williams to testify about his prior convictions for assault and violation of a protective order in the State's rebuttal case. Appellant asserts that Williams's testimony was not proper rebuttal evidence, because appellant did not testify with respect to "the events that resulted in the first protective order and his going to prison until January 2012" during the defense's case-in-chief. Further, appellant insists that his testimony did not include a discussion or denial of the assault in question. Consequently, appellant claims that "Williams['] testimony was not competent

27

rebuttal evidence which explained, or directly replied to, or contradicted, any new matter that had been brought into the case by appellant's testimony," and thus its admission was error warranting reversal of appellant's convictions.

The State responds that appellant did not preserve this issue, because defense counsel failed to object when Williams testified about appellant's prior convictions, and that there was no "temporal proximity" between the trial court's ruling on the motion in limine and Williams's testimony. *See Dyce v. State*, 85 Md. App. 193, 198 (1990) (appellate court exercised discretion to consider an issue raised during the cross-examination of a witness following the motion in limine, even though trial counsel did not object during the cross-examination, because "the first question posed on cross-examination[] was separated only by [the witness's] direct examination," which was "relatively brief (it is recorded on 14 pages of the trial transcript)"). As to the merits, the State argues that the court properly exercised its discretion when it ruled that such testimony was proper rebuttal testimony.

As an initial matter, we conclude that appellant's argument is preserved. Although the State is correct that defense counsel failed to object when Williams testified, only one witness, Detective Jefferson Davis, testified in between when the trial court ruled in favor of the State's motion in limine and when the State called Williams to testify in rebuttal. The State asked only five questions of Det. Davis, and defense counsel declined to cross-examine him. In our view, the interlude of Det. Davis's testimony, which takes up less than two pages of the trial transcript, was "relatively brief," and thus we exercise our discretion to

28

consider appellant's challenge to Williams's testimony during the State's rebuttal case. *See id*.

"Rebuttal evidence is 'any competent evidence which explains, or is a direct reply to, or a contradiction of any new matter that has been brought into the case by the defense.'" *Rollins v. State*, 161 Md. App. 34, 89 (2005) (quoting *Collins v. State*, 373 Md. 130, 142 (2003)). Ruling on the admissibility of rebuttal evidence is a matter within the sound discretion of the trial court, "and will be reversed only if it is manifestly wrong and substantially injurious." *Rollins*, 161 Md. App. at 89 (citations and internal quotation marks omitted).

In the instant case, appellant testified during the defense's case-in-chief that he had contact with Williams "several times" between when he was released from jail in January 2012 and June 2012. Specifically, appellant testified that Williams emailed him in February 2012; that Williams emailed him her new phone number and they talked on the phone in May 2012; and that appellant called Williams the week after Father's Day in June 2012 to meet at a park so that appellant could see their son. According to appellant, he called Williams three times during this five-month time period, and Williams called him twice. Appellant further testified that Williams initially contacted appellant, and that they "basically had common banter back and forth. It wasn't any type of ill feelings involved all the way up until right around June . . . . That's when everything went down hill. But, before that everything was fine."

Given appellant's testimony that Williams and appellant were in contact between January and June 2012, that Williams often initiated such contact, and that there were no "ill feelings involved" during the majority of this time, the trial court did not abuse its discretion in allowing the State to challenge the credibility of appellant's testimony by allowing testimony on appellant's convictions for assault and violation of a protective order and the details behind such convictions. As the court explained during its evidentiary ruling:

> [I]t's not just that it's a prior conviction, it's that it's a prior conviction in which he was convicted of assaulting her. That, to me, is very significant. He did testify that this was a banter between the two of them. **The fact that there was a prior assault I think is very relevant to judge the credibility between the two of them. That's what it comes down to as to whether or not she was generally afraid or not, so I am going to permit it.**
>
> ***
>
> I think one of the issues in this case the jury will have to decide is **is the email correspondence between the two of them consensual or is [Williams] credible when she says this was the result of fear and a decision she made to try and be able to prove from whom these emails were coming.** I think that's a fair very brief summation of her testimony and testimony that on a prior occasion within a very short period of time of this occurring there was a Protective Order. He violated the Protective Order. He got arrested for violating the Protective Order. Then he came back and violated it again. I think it goes a long way of explaining to the jury why it's credible that these conversations on line were the result of what she said.
>
> I am going to permit it. If you want me to give a limiting instruction saying that it can be considered. Whatever you want me to say I will, but I think it is important that the jury have that information to determine the credibility of each witness. I am going to permit them to get into the facts of those events.

(Emphasis added).

30

We agree with the trial court that appellant's two prior convictions were relevant to assessing the credibility of appellant's testimony regarding the nature and extent of his contact with Williams from January through June 2012, as well as the credibility of Williams's testimony that she thought appellant was the author of the harassing emails and that she was afraid of appellant. Thus, evidence relating to these convictions explained, directly replied to, and contradicted "new matter . . . brought into the case by the defense." *Rollins*, 161 Md. App. at 89 (quoting *Collins*, 373 Md. at 142). Accordingly, the trial court did not abuse its discretion by admitting the rebuttal evidence in question.

### (B) Prior Bad Acts

Nevertheless, appellant contends that, even if his testimony "permitted some rebuttal evidence from Williams," it did not permit a detailed recounting of the noted assault, which "constituted inadmissible other crimes/bad-acts evidence whose unfair prejudice far exceeded any probative value." Appellant asserts that Williams's testimony was not relevant to one of the exceptions provided for in Maryland Rule 5-404 and, further, was not more probative than prejudicial. Accordingly, appellant concludes asserts that admission of Williams's testimony was reversible error.

The State responds that appellant failed to preserve his "prior bad acts" argument for appellate review. We agree with the State. During the motion in limine regarding the evidence of appellant's convictions for assault and violation of the protective order, defense counsel raised the issue of whether such testimony constituted proper rebuttal evidence; he

31

never asserted that such evidence constituted improper character evidence in violation of

Maryland Rule 5-404. Accordingly, we will not address appellant's argument.

## V. Email Evidence

### *(A) Authentication of Emails*

Appellant contends that the trial court erred by admitting printouts of emails that

Williams claimed were sent to her by appellant, because the emails were not authenticated.

Appellant insists that without

> either an admission from [him] as to the content of the email messages, evidence from either Williams's or [his] email accounts or computers, or evidence from one of the email providers, the printouts of the email messages could not be properly authenticated when such evidence could easily be doctored or fabricated to appear to be something it is not.

The State responds that Williams presented sufficient direct and circumstantial

evidence to authenticate the emails. We agree with the State.

In *Dickens v. State*, this Court explained that "the burden of proof for authentication

is slight, and the court need not find that the evidence is necessarily what the proponent

claims, but only that there is sufficient evidence that the *jury* ultimately might do so." 175

Md. App. 231, 239 (2007) (emphasis in original) (citations and internal quotation marks

omitted); *see also Griffin v. State*, 419 Md. 343, 366-67 (2011) (citing to *Dickens* for the

proposition that "the burden of proof for authentication is slight").

We recently addressed the issue of authenticating emails in *Donati*. *See* 215 Md.

App. at 709-11. In *Donati,* we explained:

Maryland Rule 5-901 addresses the requirements to authenticate evidence, including electronically stored evidence. It provides as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a).

***

In *Lorraine* [*v. Markel Am. Ins. Co.*, 241 F.R.D. 534 (D. Md. 2007)], Judge Paul W. Grimm discussed **the "many ways" in which e-mail evidence may be authenticated:**

> "**[E]-mail messages may be authenticated by direct or circumstantial evidence. An e-mail message's distinctive characteristics, including its 'contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances[,]' may be sufficient for authentication.**
>
> **Printouts of e-mail messages ordinarily bear the sender's e-mail address, providing circumstantial evidence that the message was transmitted by the person identified in the e-mail address.** In responding to an e-mail message, the person receiving the message may transmit the reply using the computer's reply function, which automatically routes the message to the address from which the original message came. Use of the reply function indicates that the reply message was sent to the sender's listed e-mail address.
>
> **The contents of the e-mail may help show authentication by revealing details known only to the sender and the person receiving the message.**
>
> E-mails may even be self-authenticating. Under Rule 902(7), labels or tags affixed in the course of business require no authentication. Business e-mails

often contain information showing the origin of the transmission and identifying the employer-company. The identification marker alone may be sufficient to authenticate an e-mail under Rule 902(7). However, the sending address in an e-mail message is not conclusive, since e-mail messages can be sent by persons other than the named sender. For example, a person with unauthorized access to a computer can transmit e-mail messages under the computer owner's name. Because of the potential for unauthorized transmission of e-mail messages, **authentication requires testimony from a person with personal knowledge of the transmission or receipt to ensure its trustworthiness.**"

*Id.* at 554 (quoting Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 900.07[3][c] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997)).

Judge Grimm further noted:

**Courts . . . have approved the authentication of e-mail by the above described methods.** *See, e.g.*, [*United States v.*] *Siddiqui*, 235 F.3d [1318,] 1322-23 [(11th Cir. 2000)] (E-mail may be authenticated entirely by circumstantial evidence, including its distinctive characteristics); [*United States v.*] *Safavian*, 435 F. Supp. 2d [36,] 40 [(D.D.C.2006)] (recognizing that e-mail may be authenticated by distinctive characteristics 901(b)(4), or by comparison of exemplars with other e-mails that already have been authenticated 901(b)(3))*; Rambus* [*Inc. v. Infineon Technologies AG*], 348 F. Supp. 2d 698 [(E.D.Va. 2004)] (E-mail that qualifies as business record may be self-authenticating under 902(11)); *In re F.P.*, 878 A.2d [91,] 94 [(Pa. Sup. Ct. 2005)] (E-mail may be authenticated by direct or circumstantial evidence).

*Id*. at 554-55.

*Donati*, 215 Md. App. at 709-11 (emphasis added).

In the case *sub judice*, the State presented sufficient circumstantial evidence to authenticate the email printouts. First, appellant testified that both the michaeljohnson516@yahoo.com and the rifraffshawn@yahoo.com email addresses belonged to him. Appellant's admissions thus "provid[e] circumstantial evidence that the message was transmitted by the person identified in the e-mail address." *Donati*, 215 Md. App. at 710 (quoting *Lorraine*, 241 F.R.D. at 554).

Second, Williams testified that various details in the emails were known by appellant, such as (1) referring to Williams as "Big Head," a nickname that only appellant used; (2) referring to Williams's sexual abuse when she was a child; (3) referring to appellant's and Williams's son by name; (4) saying that he "swore to beans," which was a common phrase used by appellant "when he's swearing on his grandmother's grave"; (5) saying that Williams was "the mother of his child"; (6) referring to their romantic history and subsequent marital problems, including the woman with whom appellant had an affair; (7) signing an email "Your Mike"; and (8) referring to Williams's mother's history of breast cancer. All of these details, considered together, "'help[ed] show authentication by revealing details known only to the sender and the person receiving the message.'" *Id.*; *see also id.* at 713 ("Other circumstances have included an e-mail reference to the author with the defendant's nickname, where the context of the e-mail revealed details that only the defendant would know, and where the defendant called soon after the receipt of the e-mail,

35

making the same requests that were made in the e-mail.").

Third, forensic evidence provided circumstantial evidence that appellant sent the e-mails at issue. Detective Michael Brackett testified that 4,113 instances of the word "Riffraffshawn" were found on one of the computers seized at appellant's mother's home, as well as "instances of website history for BlackPlanet.com," including a web page title for "Angellwet-wet - BlackPlanet.com." In addition, appellant's mother's home was the physical address associated with the IP address for the e-mails sent by the riffraffshawn@yahoo.com email account. Such "forensic evidence connecting a computer . . . from which the e-mails were sent" is an acceptable means of providing circumstantial evidence to support authentication. *Id.* at 713. Given the ample circumstantial evidence presented in this case that the email printouts were what Williams claimed them to be, namely, emails sent to her by appellant, coupled with the "low bar" for authentication, the trial court did not err in ruling that the email printouts had been authenticated. *See Griffin*, 419 Md. at 367 (Harrell, J., dissenting).

*(B) Best Evidence Rule*

Appellant asserts that the email printouts were not the best evidence of the emails in question. Specifically, appellant claims that "there was never any explanation why the only evidence offered was the printouts of the emails instead of getting the actual emails from a computer or one of the email providers." Although appellant did admit the emails at issue were sent from his email address, he denied sending them. Consequently, appellant

36

contends that there was no reason to merely introduce printouts of the noted emails, and that doing so violated the best evidence rule and constituted reversible error.

The State responds that appellant's best evidence argument is not preserved, because appellant did not seek to exclude the emails on that basis. We agree with the State.

During the hearing on the motion in limine, defense counsel raised two arguments regarding the admission of the emails: whether they could be authenticated by Williams alone, and whether they could overcome the hearsay rule. Defense counsel never raised the best evidence rule, which is a distinct rule from both authentication and hearsay. *Compare* Md. Rule 5-1003 *with* Md. Rule 5-802 *and* Md. Rule 5-901. As a result, this issue is not preserved for appellate review.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**